INGVALD ALSAKER v. DeGRAFF LUMBER COMPANY.[1]

June 8, 1951.

No. 35,292.

*Ahles & Ahles* and *Frank J. Zima, Sr.,* for appellant.

*John J. Sexton* and *Robert J. Tyrrell,* for respondent.

[1]Reported in 48 N. W. (2d) 431.

MAGNEY, JUSTICE.

Verdict for the plaintiff. On defendant's alternative motion for judgment or a new trial, judgment was granted notwithstanding the verdict. Plaintiff appeals.

DeGraff Lumber Company, a corporation, is engaged in the retail lumber business at DeGraff, this state. It is the owner of a Wilson electric saw which is mounted on a bench. The circular blade of the saw is connected directly with the shaft of an electric 5-horsepower motor. Defendant's lumber shed runs north and south, and the saw bench was set in the center driveway lengthwise of it. The bench is equipped with a carrier. When boards are to be ripped, they are placed on the carrier and shoved through the saw, from left to right, or from north to south. The saw blade revolves clockwise, that is, up toward the work.

Lloyd Elliott is a farmer who lives in the vicinity. He was about to build a new barn and consulted John M. McCarthy, president of defendant, about furnishing the lumber. His plans called for curved rafters. Defendant had no curved rafters in stock. McCarthy suggested that Elliott get in touch with Carl Amundson, the only man in that area who knew how to make curved rafters and who had made several sets on defendant's saw rig. Elliott and Amundson got in touch with each other, and Amundson was employed by Elliott. Defendant furnished Elliott with inch boards 12 inches wide and 16 feet long. On the Saturday before the accident, Amundson, with assistance, ripped four inches off the boards and then cut them in two, thus making two boards 8 feet long and 8 inches wide. On Monday morning, June 27, 1949, Amundson, his son Harris, and plaintiff went to defendant's lumber shed to cut out the curved rafters. All the men were employed and paid by Elliott. Amundson first made a form or a jig, which was to be placed underneath the blade of the saw and so contrived that an 8-foot board could be passed through the saw and cut on a curve. After the form had been made, the men commenced sawing curved rafters. Amundson was feeding the saw. Plaintiff was taking the 8-foot boards to him from a stock pile of such boards placed north

of the bench. Harris was taking away the curved boards and also nailing them together. Two curved boards were put together, staggered, and nailed. In the afternoon, one Alfred Hanson came along, and Amundson asked him to help. At first he nailed the rafters, then took boards away from the saw while Harris nailed. A board had been pushed through the saw. Hanson was trying to take it away; in so doing he fumbled, and the board came in contact with the saw. A piece of board was caught by it and thrown off, striking plaintiff and seriously injuring him.

If the saw had at the time been protected by the guard especially made for it, the accident would not have happened. This guard consists of a metal bar 16 inches long with a movable foot or claw at the end of it. This foot-like arrangement operates on a swivel. When a board has passed through the saw, the guard drops down and blocks the board from coming back and getting in contact with the saw again. The guard is part of the regular equipment. Amundson testified that at the times he had operated the saw he had never seen a guard attached to it. Harris said he had never seen the guard on the saw rig. McCarthy and Reagan, his yard foreman, both said that the guard was always on the saw when Amundson operated it. There was testimony by a witness for plaintiff that after the accident Reagan dug the guard out from old sawdust on the floor and put it in place, while Reagan claims that the guard was never off the machine; that it was on the machine on the preceding Saturday morning; and that after the accident it was lying on the floor near the table. McCarthy's testimony was to the same effect. It is difficult to believe that this conflict in testimony is based on faulty honest recollection. Be that as it may, such discrepancy has no bearing on the disposition which we are making of the case. The evidence supports the claim that the guard was not in place at the time of the accident.

It was not a part of the deal with Elliott that defendant should furnish the crew to turn these boards into curved rafters. All defendant furnished was the lumber and the use of the saw rig.

Neither McCarthy nor Reagan directed the men how the work was to be done. Defendant furnished no supervision of any kind. All McCarthy did was to point out the lumber to be used for the pur-. pose and what disposition to be made of the small pieces and the refuse. On the day of the accident he was not at the lumberyard.

We have probably gone into too much detail in setting out the facts, but it seems desirable to have a complete picture presented. On the facts as above set out, the court ordered judgment for defendant notwithstanding the verdict.

At the request of counsel for plaintiff, the question of common-law liability, if any, was not submitted to the jury. The only question involved here, therefore, is whether M. S. A. 182.01 applies to this defendant under the facts as outlined. If it does apply, the court was in error in granting the motion for judgment notwithstanding the verdict. If it does not apply to defendant under our facts, the ruling of the court was correct.

Section 182.01, insofar as applicable here, reads as follows:

"* * * all dangerous parts of machinery; * * * in any factory, * * * mill, workshop, * * * or other places where persons are employed, or otherwise engaged, shall be fenced, boxed, or otherwise protected to the fullest degree practicable."

Plaintiff contends that defendant was guilty of negligence in failing to provide a guard for the saw, in violation of the statute. He argues that he was there with the express consent of defendant, working for its benefit, because one of the conditions of the agreement between defendant and Elliott was that the curved rafters were to be fabricated under defendant's supervision at its yard and delivered in a finished condition to Elliott's farm, and that the control and direction of the men doing the work was with defendant. The record does not bear out any of the above contentions, except the one that plaintiff was there at the express consent of defendant. There was no agreement that the rafters were to be fabricated under defendant's supervision, and they were in fact not fabricated under its supervision. All that defendant did was

to permit Elliott through his own hired men to use the saw rig located on its premises.

Plaintiff relies on Kanz v. J. Neils Lbr. Co. 114 Minn. 466, 131 N. W. 643, 36 L.R.A.(N.S.) 269, decided in 1911. In that case defendant owned a sawmill. In addition to the usual machinery, it was equipped with saws for the cutting of slabs into lath stock. Defendant and one John Kreiling entered into a contract by the terms of which Kreiling agreed to manufacture into lath such material as defendant desired at an agreed price per thousand. Defendant was to furnish all machinery and supplies, Kreiling to do the millwright work that was necessary to keep the machinery in the lath mill in good running order, and to hire and pay one man to attend to the slasher. Plaintiff was hired by Kreiling and did work on the slasher. The table and saws of the slasher were not in the lath mill. While working on the slasher, plaintiff was injured by stepping into one of the holes in which there were sprocket wheels that carried chains. The trial court held that the relation of master and servant did not exist between defendant and plaintiff, but submitted the case to the jury on the question of defendant's failure to guard the holes where the sprocket wheel ran, in effect instructing the jury that it was negligence on the part of defendant not to guard these holes unless it was impracticable to do so. This court said (114 Minn. 469, 131 N. W. 644) :

"* * * This table and the saws were not in the lath mill, and it was defendant's duty, not Kreiling's, to comply with the statutory requirements relating to the guarding of dangerous machinery. * * *

"* * * We think it clear that defendant owed plaintiff the duty to guard these sprocket wheels and chains in the holes if it was practicable to do so, whether he was strictly defendant's servant or Kreiling's. He was employed, with defendant's knowledge, to work on this slasher table, which was entirely under defendant's control."

It will be observed that defendant in that case was in full possession of the slasher machine, that it was his duty to maintain the

machine in proper condition, and that Kreiling had no duty of any kind in connection with the slasher machine. Under the fact situation in that case, a recovery was allowed, although plaintiff was the employe of an independent contractor, and not of defendant owner of the premises. Under later statutes, there may be serious question whether the same result would have been reached. In the instant case, the relation of Elliott to defendant was not that of an independent contractor. The electric saw rig was turned over to Elliott, with full possession and control to be used solely for Elliott's own purpose and benefit. Plaintiff was clearly not defendant's employe, and he was not the employe of an independent contractor of defendant using defendant's premises and facilities for the mutual benefit of the contracting parties.

Plaintiff also relies on Tvedt v. Wheeler (1897) 70 Minn. 161, 72 N. W. 1062, in which case defendant leased a building for a warehouse. At one end of an elevator shaft was an unguarded wheel hole. Lessee continued to use the building with the wheel hole unguarded. Plaintiff, an employe of lessee, was injured. This court held, construing G. S. 1894, § 2250, relating to the protection of employes, that the initial duty rested upon defendant to guard the wheel hole before using the building himself or leasing it to another for use as a warehouse, and that he was liable to plaintiff, who was injured by his neglect to comply with the statute. The statute reads:

"All hoistways, hatchways, elevator wells and wheelholes in factories, mills, workshops, storehouses, warerooms or stores shall be securely fenced, enclosed or otherwise protected, * * *."

Mr. Justice Mitchell, in a vigorous dissent, stated (70 Minn. 171, 72 N. W. 1065):

"It is clear that there was a failure to perform a statutory duty designed for the protection of employees and others lawfully employed in the warehouse. The question is upon whom was that duty imposed? or, to state the question in another form, is the defendant

upon the facts stated liable for its nonperformance? It seems to me that there cannot be any doubt that, if common-law principles are to obtain, the defendant is not liable. * * *

* * * * *

"The evident intention of the legislature was to protect employees and licensees in buildings, when used for the purposes specified. It is the use of the building, and not the mere design of the owner in constructing it, which creates the duty of protecting hatchways, elevator wells, etc."

Nelson v. Wm. H. Ziegler Co. Inc. 190 Minn. 313, 251 N. W. 534, also cited by plaintiff, has no bearing here. There, plaintiff claimed that a certain coal conveyor was sold by defendant with a warranty that it fulfilled the requirements of the statute as to the guarding of machinery. The jury found that there was a warranty and that the conveyor was not guarded as required by the statute, which prohibited the manufacture or sale of any machine whose points of danger were not guarded whenever practicable. The relationship between the parties was that of buyer and seller.

The earliest of the so-called factory acts in Minnesota is L. 1893, c. 7. The title of this act reads: "An Act providing for the protection of Employes," and § 1 thereof provides in part as follows:

"All saws, * * * shall be so located as not to be dangerous to workmen, or shall be, as far as practicable, properly guarded, fenced or otherwise protected. All dangerous places in or about factories, mills, workshops, and public and private works, near to which any employe is obliged to pass, or to be employed, shall be securely fenced, inclosed or otherwise protected."

By L. 1911, c. 288, § 1, the following provision was added:

"* * * If a machine or any part thereof is in a dangerous condition or is not properly guarded, the use thereof may be prohibited by the commissioner of labor and his assistants and notice to that effect shall be attached thereto. Such notice shall not be removed until the machine is made safe and the required safeguard pro-

vided, and in the meantime such unsafe or dangerous machinery shall not be used."

The factory acts were again amended by L. 1913, c. 316. This chapter is entitled: "An Act to require more adequate protection of employees from accidental injury or death in the course of their occupation, repealing certain sections of the factory acts, and providing penalties for violations of the act." The following new provision (§ 19) was added to the act:

"Every order, suggestion, or notice served upon any employer of labor, owner or manager of any building, or other person, shall be certified by a receipt for the same taken by the officer or employee of the labor department serving such order, suggestion or notice, which receipt shall be signed by the owner, manager or superintendent of said employer. *No liability to any person other than an employee shall attach to any owner of any factory, mill, workshop, engineering works, or mercantile establishment, because of the provisions of this act, until notice to comply with the terms of this act has been served upon such owner by an officer or employee of the labor department of this state, and reasonable time to comply with such notice has elapsed.*" (Italics supplied.)

This is now M. S. A. 182.18, with the exception that the words "because of the provisions of this act" have been changed to "because of the provisions of sections 182.01 to 182.20," the words "department of labor and industry" have been substituted for the words "labor department," and the word "thereof" has been substituted for the words "of this act."

In the instant case, plaintiff was not an employe of defendant. There is nothing in the record to show that a notice such as is referred to in § 182.18 was served. If plaintiff had been an employe of defendant, he would have been entitled to relief under the workmen's compensation act. It seems obvious that L. 1913, c. 316, operates only when the relation between the parties is that of employe and employer, especially in view of the notice provision in § 182.18. Kanz v. J. Neils Lbr. Co. 114 Minn. 466, 131 N. W.

643, and Tvedt v. Wheeler, 70 Minn. 161, 72 N. W. 1062, both *supra,* the decisions relied upon by plaintiff, were decided prior to the enactment of L. 1913, c. 316.

In Landy v. Olson & Serley S. & D. Co. 171 Minn. 440, 214 N. W. 659, plaintiff's decedent took a window sash to defendant's factory for repairs, and while on defendant's premises fell into an elevator shaft. In discussing the question whether the statutory provision with reference to the guarding of elevator shafts applied, the court said (171 Minn. 444, 214 N. W. 661):

"Plaintiff's action cannot rest upon G. S. 1923, § 4152, which is exclusively for the protection of employes. See title, L. 1913, p. 455, c. 316; Hamilton v. Minneapolis Desk Mfg. Co. 78 Minn. 3, 80 N. W. 693, 79 Am. St. 350."

In Gibbons v. Gooding, 153 Minn. 225, 229, 190 N. W. 256, 258, also involving the case of a person not an employe injured in an elevator shaft, we said:

"* * * The statutes cited as violated are: Sections 3862, 3873, 3874, 3881 and 8759, G. S. 1913. The only one of these sections to touch elevators or elevator shafts is 3873 and that relates to workshops and factories and the protection of employes therein." See, DeVere v. Parten, 222 Minn. 211, 23 N. W. (2d) 584.

The notice provision of § 182.18 is a declaration by the legislature that no liability shall attach to the owner of any factory, mill, workshop, engineering works, or mercantile establishment, on account of violations of the provisions of the act to any person except employes, until notice to comply, as provided in § 182.18, has been given. The question of the person for whose benefit or protection a statutory duty is imposed depends upon the purview of the legislature in the particular statute and the language which it has there employed. Rosse v. St. Paul & D. Ry. Co. 68 Minn. 216, 71 N. W. 20, 37 L. R. A. 591.

In Restatement, Torts, § 286, *comment e*, it is stated:

"A statute or ordinance may, because of its title, preamble, history or otherwise, be construed as intended to protect only the interests of a particular class of individuals. If so, a violation of the enactment can make the actor liable only to a person of that class."

And in *comment f* under the same section it states:

"The fact that a legislative enactment requires a particular act to be done for the protection of the interests of a particular class of individuals does not preclude the possibility that the doing of such an act may be negligence at common law toward other classes of persons."

Judgment notwithstanding the verdict was granted upon the ground that the plaintiff was not in the class of persons entitled to the protection of M. S. A. c. 182. In our opinion, having in mind particularly § 182.18 of that chapter, the court was correct in its ruling.

Order affirmed.