EDWARD L. THILL v. MODERN ERECTING COMPANY AND OTHERS.
ASHBACH CONSTRUCTION COMPANY AND OTHERS, THIRD-PARTY DEFENDANTS.

136 N. W. (2d) 677.

September 3, 1965—Nos. 39,448, 39,449.

*Faegre & Benson, Paul J. McGough, Wright W. Brooks,* and *Martin N. Burke,* for appellant Modern Erecting Company.

*Ryan, Kain, Mangan, Westphal & Kressel* and *William P. Westphal,* for appellant Johnson, Drake & Piper, Inc.

*Grannis & Grannis, Vance B. Grannis, Sr.,* and *David L. Grannis, Jr.,* for respondent Thill.

*Robins, Davis & Lyons* and *John D. Rice,* for respondent Wesley Janshen.

*Robb, Robb & Van Eps,* for respondent J. L. Shiely Company.

*Hoppe & Healy* and *Robert J. Healy,* for respondent Jesco, Inc.

*Tyrrell, Jardine, Logan & O'Brien* and *Robert J. Tyrrell,* for respondent Ashbach Construction Company.

ROGOSHESKE, JUSTICE.

Defendants Johnson, Drake & Piper, Inc.,(J. D. & P.) and Modern Erecting Company (Modern) appeal from denials of separate motions for judgment upon amended findings of fact or for a new trial.

The accident from which this case arose occurred on June 23, 1960, during the building of a hangar and one-story office and shop building for Western Airlines at Minneapolis-St. Paul International Airport-Wold-Chamberlain Field. J. D. & P. was the general contractor for the job. Jesco, Inc., was a subcontractor for pouring certain concrete work including the roof slab; J. L. Shiely Company supplied the concrete for the job; Modern Erecting Company furnished a truck crane and two of its employees, Harlan Stowe and Wesley Janshen, at an hourly rental to J. D. & P. to accomplish pouring the roof slab. Ashbach Construction Company, plaintiff's employer, was the subcontractor for certain earth-moving work around the building.

On the day of the accident Ashbach sent plaintiff, Edward Thill, and two other employees to backfill around a fuel oil tank located on the southeast corner of the building under construction. On the same day J. D. & P. scheduled pouring the roof slab. The crane furnished by Modern was set up about midway along the 51-foot east wall of the building for the purpose of elevating bucketfuls of concrete to the roof where they would be poured by Jesco workmen. After 15 or 20 loads had been lifted, the crane, midway in swinging a load to the roof, tipped on its side. The boom fell directly on the plaintiff as he sat on his tractor seat, causing injuries from which he became a paraplegic.

Plaintiff brought action based on negligence against J. D. & P., Modern, Shiely, and Jesco. Ashbach was brought into the action by the third-party complaint filed by Modern, as were Modern's employees, Stowe

and Janshen. Various cross-claims were made among the defendants, none of which are significant on this appeal except J. D. & P.'s claim against Modern for common-law indemnity and its claim against Jesco for contractual indemnity.

By special verdict the jury found causal negligence by J. D. & P., Modern, and Janshen, and that Shiely, Ashbach, and Jesco were not negligent. The court found negligence on the part of Stowe, who had answered but had appeared only as a witness. The court also found as a matter of law that the parties were not engaged in a common enterprise, and it denied J. D. & P.'s claims for indemnity. The court thus absolved Shiely, Jesco, and Ashbach and placed liability equally on J. D. & P. and Modern as joint tortfeasors. Modern was granted indemnity against its two negligent employees, Stowe and Janshen. Although the jury awarded damages of $642,400, the court found any amount above $375,000 excessive and granted J. D. & P.'s and Modern's motions for new trial unless plaintiff accepted a reduction of the verdict to $375,000. Plaintiff filed a written acceptance but he seeks on appeal to have the verdict reinstated.

Because the issues presented concern placing ultimate liability among the several defendants it is necessary to set out in considerable detail the evidence relevant to their relationships and each one's part in the mishap.

The voluminous record contains few conflicts in the testimony. Determining the cause of the crane's tipping and which participants are to be held liable for negligence is essentially a problem of choosing between divergent inferences from undisputed testimony and facts. We, of course, are committed to those inferences which tend to support the decision below.

On the day of the accident plaintiff and two fellow employees of Ashbach arrived at the construction site about 7:30 a. m. Their employer had instructed them to backfill around a large fuel tank which had been placed in a hole at the southeast corner of the partially constructed building. The dirt from the excavation was piled in two heaps close to the hole. Plaintiff commenced to move this dirt into the hole with a small back-hoe tractor while the other two employees tamped. Two or three days previously, J. D. & P., the general contractor, had notified Ashbach that the hole could be filled.

The seven or eight man crew of Jesco arrived on the job at about 8 a. m. Their plan was to pour the concrete roof slab in "passes" along the width of the building's roof. The building ran 252 feet east and west, and 51 feet on its north-south side. Its height was 18 feet. The Jesco men planned to pour passes 10 to 12 feet wide in strips running the width of the building, starting at the north side.

The truck crane from Modern together with Stowe, the operator, and Janshen, the oiler, arrived around 8 a. m. The crane was an American crane, weighing 25 tons, consisting of a cab and truck chassis permitting its operation over the road on rubber tires. From controls in the cab the operator manipulated the boom and a bucket attached to cables. The crane was first located in a parking lot where Stowe and Janshen rigged the cables, fitted on a boom of 60 feet and extended it to 90 feet by attaching a 30-foot jib, and attached the bucket furnished by J. D. & P. After this preparation, the crane was ready to be set in place. Alvin G. Olson, the J. D. & P. foreman, suggested that it be placed along the south wall of the building in order to avoid a number of moves. Stowe, however, preferred the east side, where he would not have to work "blind" as much and Olson concurred. The crane was then moved into position. There was a slight incline away from the building, but the rear wheels were spun so that they would sink into the earth, thereby to some extent leveling the crane. The ground in the area was wet, muddy, and spongy. Stowe and Janshen then proceeded to block the crane so that it would be stable during their operation. The crane was equipped with four outrigger steel I-beams, each 8 feet long; two on each side of the bed of the truck and encased in channels so they could be moved outward and could be locked in place with steel pins. Modern's employees slid these four I-beams out from their channels so that they protruded 2½ feet from the sides of the crane at the four corners. They were not locked in place because the locking pins were missing. Under each I-beam upon the ground they placed two 8" x 8" x 4' softwood timbers worn or rounded at the edges. They then stacked upon them 12" x 12" x 10" hardwood blocks, then some 6", 4", and 2" blocks and plywood to shim up to the underside of each outrigger. The blocking was made firm by swinging the boom from side to side and placing pieces of wood shims under the outriggers on the

opposite side from the boom as the weight shifted. Although only hard- wood blocks and sometimes mechanical jacks are used to lift the weight of the truck crane off its springs and wheels and stabilize it, the blocking materials used were the only materials available at Modern's yard. As noted, also absent were the locking pins, designed to prevent the I-beams from slipping in and out of their channels. With the weight of the crane off its wheels and upon the blocked outriggers, the crane was ready to elevate concrete. At about 9 a. m. Olson, who had been around the area while the crane was being set up, inspected it and said, "It looks good" or words to that effect. At the trial he admitted that he knew the purpose of the outriggers, blocking, and pins, but he did not inspect the machine carefully; and he was ignorant of the absence of the pins.

The Shiely ready-mix trucks, which had previously been dispatched to the scene, moved into position to unload about 40 feet from the crane. Arthur L. Goetzke, the Jesco foreman, positioned Frank K. Sylvers, a Jesco employee, at the unloading truck to guide the bucket underneath the truck spout as the bucket was lowered from the boom, to see that it was filled, and to signal the truck driver to stop the flow and the crane operator to start the bucket on its way to the roof. The bucket, which weighed 870 pounds, had an opening at the top and one at the bottom for filling and emptying. Its rated capacity was one cubic yard, although it could hold 33 cubic feet completely full. Goetzke started the first bucketful on its way; he filled it about three-fourths full, looked with satisfaction at its progress to the roof, and then left Sylvers in charge.

Stowe's procedure on each lift was approximately the same. He waited for Sylvers' signal, took up the cable to lift the bucket and move it from the truck, raised the boom, shortening his operating radius by about 10 feet, then swung the boom 180 degrees to the roof. For about the first ten loads, he operated by his own vision. After the completion of the first pass, however, it was necessary for a workman to signal the position of the bucket for emptying from the roof. Janshen kept watch outside the crane cab, inspecting the blocks and knocking them back into place with a maul if they were jolted out of position. For about 5 minutes prior to the accident, however, he was in the cab to escape from the intermittent but

substantial rain. Stowe observed plaintiff backfilling when the crane first arrived but he did not see him after that.

During the first few loads, plaintiff continued to work. When he noticed that the crane boom was passing directly above his head, he moved to the other side of the excavation, about 60 or 70 feet from the crane.

The mishap occurred after 15 to 20 buckets of concrete had been lifted to the roof. Each time Sylvers signaled to stop the flow when the bucket was about three-fourths full, but the last bucketful, through some miscalculation, was loaded to the top. The contents of the bucket, 33 cubic feet of concrete, weighed 5,039.1 pounds. Adding the weight of the bucket, 870 pounds, the total weight of the load was 5,909.1 pounds. According to a table computed by the manufacturer and tacked on the inside of the cab, maximum load for the crane with outriggers set, a 90-foot boom including the jib, and a 40-foot radius (the maximum radius at which the crane operated that day), was 9,450 pounds. Since the manufacturer's recommendations were 85 percent of absolute maximum load, the bucketful in question should have been well within safe limitations.

As Stowe swung the boom, however, he suddenly felt the outriggers behind him rise. He looked to the front, saw the boom dip, and attempted to decrease the radius. The boom continued to tip, and as it crashed to the ground, Stowe leaped out the open door. Janshen was caught inside but was unharmed. The boom, midway on its swing, fell directly on plaintiff, pinning him in a jackknifed position upon the tractor seat until the boom could be lifted 30 minutes later. He suffered excruciating pain and sustained fractures of his skull, one shoulder, ribs, and spine.

Inspection of the crane following the accident revealed that all four outriggers had slipped back underneath the crane into their channels. The blocking on the side toward which the crane had fallen was driven into the earth about 8 inches, and one of the timbers was split.

■ Before discussing the determination of liability among the parties, we agree that the trial court was correct in concluding that plaintiff was not engaged in the same or related purpose with the employees of any of the defendants. His backfilling was not a common activity with the work of the employees of any other contractor engaged in the concrete pouring so as to deny him common-law rights against any third-party employer

under the workmen's compensation statutes. McCourtie v. United States Steel Corp. 253 Minn. 501, 93 N. W. (2d) 552.

■ The basic issues in this case, then, must be resolved upon the principles of negligence and an employer's liability for the acts and omissions of its agents and servants.

Although the evidence would have permitted a finding that Shiely and Jesco were negligent in allowing the bucket to be more than three-fourths full and that Ashbach was negligent in failing to provide a safe place for plaintiff to work, the jury was clearly justified in finding their employees free of negligence. So, too, was the jury justified in finding that Modern had breached its duty as a bailor for hire—which was to supply equipment reasonably safe for its intended use and competent operators—by its negligent conduct in failing to furnish outrigger locking pins and proper blocking materials or mechanical jacks, and in the failure of its employee to properly block and adequately inspect the blocking during operation.

A more difficult problem is determining the nature and extent of the general contractor's liability. Modern contends that the evidence at least raises a fact issue whether, under the rule of Nepstad v. Lambert, 235 Minn. 1, 50 N. W. (2d) 614, Stowe and Janshen at the time of the accident were servants loaned to J. D. & P. However, we do not find sufficient evidence to require submitting that issue. Rather we agree with the trial court and hold that these men as a matter of law were not loaned servants.

As exhaustively discussed in Nepstad, the criteria for determining when a worker becomes a loaned servant to a special employer are not susceptible of precise delineation. The facts of each case necessarily govern. Here they are not in dispute. The right retained by J. D. & P. to control the actions of Modern's employees was in our opinion more in the nature of general policing of the premises rather than a direct authoritative control over the manner in which they performed their work.

From the relevant facts it cannot be reasonably inferred that J. D. & P. had the right to exercise detailed authoritative control over any of the acts which might have caused the injury, whether they were those of preparing the machine or of operating it. In fact, Janshen and Stowe set up the machine by themselves; Janshen himself had sole care of keeping the

blocks in place; and, although some Jesco employees at times directed the crane with hand signals from the roof, the act which put the boom in motion to swing down on plaintiff was Stowe's. Thus it cannot be concluded that J. D. & P. had the right to direct the details of those acts. If the ultimate aim of the control test as set out in Nepstad is "to impose the liability upon the employer who was in the best position to prevent the injury," [1] it certainly is fair to conclude that Modern and its employees had at least as good an opportunity to prevent the mishap as J. D. & P.

There is not present in this case the exceedingly close attention to the details of the actions which caused the injury as there existed in Nepstad where the special employer's employees directed by hand signals every movement of the crane during its operation on the job. In the absence of evidence which could support a finding that such right of control existed it would be unjustified to impose vicarious liability upon the general contractor. It might be noted that even if there were sufficient evidence to hold otherwise, Modern would not be exonerated from liability as a joint tortfeasor since the jury may well have found that it was also negligent in furnishing unsafe equipment.

■ While we do not believe that J. D. & P. so usurped the employer's function as to incur liability for the full award of damages, it does not follow that J. D. & P. neither owed nor breached a duty to plaintiff. Familiar principles of law dictate that an owner or general contractor remains liable for the torts of an independent contractor, even if he is not liable as a master, if the owner or general contractor has retained the general control and supervision of the work and has failed to exercise reasonable care in doing so.[2] This general concept was presented specifically to the jury in terms of the duty owed by the general contractor to a business invitee on the premises. The jury was instructed that a general contractor in charge of a project is regarded as a possessor of land and is subject to the duties of a possessor.[3] The court then read substantially the language

---

[1] 235 Minn. 12, 50 N. W. (2d) 620.

[2] La Malfa v. Piombo Bros. 70 Cal. App. (2d) 840, 161 P. (2d) 964; Restatement, Torts, § 414.

[3] Dishington v. A. W. Kuettel & Sons, Inc. 255 Minn. 325, 96 N. W. (2d) 684; Restatement, Torts, § 384.

of Restatement, Torts, § 343, which deals with the liability of a possessor of land for harm caused by a "natural or artificial condition" on the land, but substituted the words "artificial instrumentality" for "a natural or artificial condition." While the more appropriate instruction might have been Restatement, Torts, § 344, specifically dealing with a general contractor's liability for negligent supervision of the instrumentalities of independent contractors, J. D. & P. could not have been prejudiced by any inaccuracy. Section 343 exacts a lesser duty as to artificial conditions upon the land than does § 344 as to an independent contractor's machines. If the jury found causal negligence under the instruction given, it would necessarily have found causal negligence under the alternative.

The court's instruction was adequate to communicate to the jury the concept that a general contractor, as a possessor of land, has a duty to exercise reasonably careful supervision of all the activities on that land and may be liable for a breach thereof.[4] There was ample evidence to support the jury's finding that J. D. & P.'s negligence concurred with Modern's to cause plaintiff's injury. Olson testified that he was around the area where Stowe and Janshen set up the crane. He stated that he was familiar with cranes in general, that he knew the uses of outrigger pins, but that he did not check the crane carefully enough to learn whether they were present.

J. D. & P. argues, however, that even if it did commit negligent acts or omissions, they were of a secondary or passive nature and therefore it should be entitled to indemnity from Modern, whose negligence was primary and active. The rule is recognized in Minnesota that one may have indemnity to the full extent of a liability if the other party's negligence is the primary cause of injury to a third party, and if the other party owes a duty to the one seeking indemnity.[5] The rule does not apply, of

[4] Rosenberg v. Schwartz, 260 N. Y. 162, 183 N. E. 282; Hooey v. Airport Const. Co. 253 N. Y. 486, 171 N. E. 752; Gardner v. Stonestown Corp. 145 Cal. App. (2d) 405, 302 P. (2d) 674; cf. Pelowski v. J. R. Watkins Medical Co. 120 Minn. 108, 139 N. W. 289, 618; Mix v. City of Minneapolis, 219 Minn. 389, 18 N. W. (2d) 130.

[5] Waylander-Peterson Co. v. G. N. Ry. Co. (8 Cir.) 201 F. (2d) 408, 37 A.L.R. (2d) 1399; Fidelity & Cas. Co. v. Northwestern Tel. Exch. Co. 140 Minn. 229, 167 N. W. 800; Minneapolis Mill Co. v. Wheeler, 31 Minn. 121,

course, if negligence is concurrent, in which case either tortfeasor may recover only contribution.[6] We agree with the trial court in its characterization of the negligence involved as concurrent. Both Olson and the Modern employees might have prevented the crane's being operated without proper blocking or outrigger pins. Both had an equal chance to inspect the machine and to pass judgment on its safety, and both had the authority to make changes. This is not a case where one party fails to discover a preexisting negligent condition, but rather one in which the negligence of both parties permitted circumstances to exist from which an accident could occur. The only just result is for both to share the liability for the resulting damage.

■  J. D. & P. also claims contractual indemnity against Jesco by virtue of a provision in the subcontractor's agreement by which Jesco agreed to save J. D. & P. harmless from loss caused by Jesco's failure to comply with the subcontract or by damage resulting from Jesco's use of tools borrowed from the contractor.[7] Since Jesco was found not to have been negligent, there is no basis for a claim that it did not comply with the subcontract. J. D. & P.'s claim that Jesco borrowed the crane is futile since J. D. & P. agreed to supply the crane, did so in fact, and supervised its preparation and operation. N. P. Ry. Co. v. Thornton Bros. Co. 206 Minn. 193, 288 N. W. 226, and Minneapolis-Moline Co. v. Chicago, M. St. P. & P. R. Co. (8 Cir.) 199 F. (2d) 725, cited by J. D. & P., are distinguishable on the basis of the extremely broad indemnity contracts in those cases.

---

16 N. W. 698; see, Hendrickson v. Minnesota Power & Light Co. 258 Minn. 368, 104 N. W. (2d) 843.

[6] Hanson v. Bailey, 249 Minn. 495, 83 N.W. (2d) 252.

[7] "The subcontractor agrees:

"(q) To save harmless the Project, the Owner and the Contractor from any and all loss or damage occasioned by the failure of the Subcontractor to comply with the term or condition of this subcontract; and if the Subcontractor rents, borrows or in any manner obtains any equipment, materials, tools, or supplies from the Owner or the Contractor for use in connection with performance of the work or otherwise, to save harmless the Project, the Owner and the Contractor from any and all loss or damage arising out of the use thereof."

In sum, there was ample evidence to support the jury's application of the law which it received from the court. It reached a just result, placing a joint and several liability on the two parties who were immediately involved in the accident and who might have prevented it.

■ Both Modern and J. D. & P., however, have asserted that other errors occurred at trial. The contention that each or all may have prejudiced appellants requires that they be dealt with in turn.

Both Modern and J. D. & P. have contested the application of Minn. St. 182.12 of the Factory Act. The trial court, quoting from the statute, instructed the jury that if either party had not taken the precautions required by the statute such a violation would constitute negligence.[8] This submission raises a number of issues: (1) May this provision of the act be applied to one who does not own the crane? (2) May it be invoked to aid plaintiff who was not an employee of the party charged? (3) What is the effect of lack of the notice required by Minn. St. 182.18?

As to the first question, J. D. & P. has cited a number of decisions which have held that an owner or independent contractor cannot be held liable to the servant of a subcontractor under a safety code upon the reasoning that the owner or general contractor did not have any control over the particular appliance involved.[9] While we agree with the general theory of these cases, this case is distinguishable from them on two grounds. First, J. D. & P., as discussed above, did exercise supervision and control sufficient to have cured any defects in the crane and to have prevented the accident, had it exercised such control with due care. Sec-

---

[8] The trial court's instruction, quoting the statute in part, was as follows:

"When practicable all cranes or other mechanical contrivances for use in erection of a building or other structures shall be so placed and operated as to give proper and adequate protection to the life and limb of any person employed or engaged thereon, and to any person or employee passing under or in proximity to the same.

"Now, that is the statutory provisions. If you find that any of the defendants violated this statute, such a violation constituted negligence on the part of the violator. This instruction about this statute, of course, does not apply to the Shiely Company, to Jesco, Inc. or to the Ashbach Company."

[9] E. g., Leet v. Block, 182 Ind. 271, 106 N. E. 373, 20 A. L. R. 654; Trecartin v. Mahony-Troast Const. Co. 18 N. J. Super. 380, 87 A. (2d) 349.

ond, § 182.12 does not specify that only one particular party, the owner, must use due care. Rather, it states that "any person, firm, or corporation" must safely erect the crane. It seems clearly intended that any party having supervisory power over a crane may be charged with the statutory duty, and we therefore conclude that J. D. & P. was properly charged with that duty in this case.

■ The second question presents a more difficult problem of statutory construction. We are met at the outset by Modern's argument that, because the Factory Act was entitled "An Act providing for the protection of Employees" when it was first passed as L. 1893, c. 7, and when revised as L. 1913, c. 316, it can apply only to the injuries of employees of the party charged or else run afoul of Minn. Const. art. 4, § 27, which requires that the subject of a law be contained in its title. We have, admittedly, held that certain provisions of the Factory Act can be invoked only to aid employees, and we have referred to the act's limited title to support that view.[10] This is not to say, however, that the constitution necessarily forbids its application to persons who are not employees. "It is not intended that the title should be an index of the law; a fair suggestion of the subject matter is all that is necessary,"[11] and a provision of the act may be extended to cover nonemployees if such extension is intended by the legislature and if it follows logically and naturally from the primary purpose of the act. The crucial distinguishing factor between this and previous cases is that § 182.12 explicitly extends coverage to "any person," whereas the other provisions we have reviewed here mentioned only employees.[12] We therefore hold that at least this provision of the Factory Act affords protection to nonemployees of the parties charged.

■ This conclusion opens the third question to review because § 182.18 provides that no liability will accrue under the Factory Act except as to an employee, fireman, or policeman, unless notice to comply with

---

[10] See, e. g., Alsaker v. DeGraff Lbr. Co. 234 Minn. 280, 48 N. W. (2d) 431; Hamilton v. Minneapolis Desk Mfg. Co. 78 Minn. 3, 80 N. W. 693.

[11] Thomas v. Housing & Redevelopment Authority of Duluth, 234 Minn. 221, 245, 48 N. W. (2d) 175, 190; Johnson v. Harrison, 47 Minn. 575, 50 N. W. 923.

[12] See, Cayse v. Foley Brothers, Inc. 255 Minn. 176, 96 N. W. (2d) 238.

the act has been given by the Department of Labor and a reasonable amount of time has passed.[13] Although it was stated in dictum that the notice provision applies only to deficiencies in completed structures,[14] it appears after thorough briefing that it also applies to construction projects. This is so because the definition of Minn. St. 175.19, once a part of the Factory Act in R. L. 1905, c. 23, but split apart in the revision of 1913, defines "engineering works" as a construction project. The Department having given no notice, it would seem that plaintiff could not rely on the Factory Act in this case.

■ Even though § 182.12 should not have been submitted to the jury, we believe that its submission failed to prejudice either J. D. & P. or Modern. It is true that the court instructed the jury that a violation of the statute was itself negligence. However, the statute is couched in such terms that the jury, in order to find a violation and therefore "negligence per se," must go through the process of deciding whether there was common-law negligence. The statute does not forbid a single, specific act and decree that commission of that act is negligence. Rather, it commands that "when practicable" precaution must be taken to give "proper and adequate protection" to persons "passing under or in proximity to" the crane. In effect this is no more than the common-law duty to use due care and the reasoning process to determine a breach is essentially similar. This process necessarily must have coincided with the jury's reasoning as to common-law negligence. We therefore believe that the statutory instruction was only a particularized version of the general negligence charge and that J. D. & P. and Modern were not prejudiced thereby.[15]

■ Somewhat related to the above argument is the assertion by Mod-

---

[13] Minn. St. 182.18. "No liability to any person other than an employee, fireman, or policeman shall attach to any owner of any factory, mill, workshop, engineering works, or mercantile establishment, because of the provisions of sections 182.01 to 182.20, until notice to comply with the terms thereof has been served upon such owner by an officer or employee of the department of labor and industry, and reasonable time to comply with such notice has elapsed."

[14] Cayse v. Foley Brothers, Inc. *supra.*

[15] Note that in Alsaker v. DeGraff Lbr. Co. *supra,* where we reversed because no notice had been given, there was no alternative theory of negligence.

ern and J. D. & P. that the court failed to instruct the jury concerning the specific duty owed by Jesco, Shiely, and Ashbach to plaintiff. The sum of the court's instructions as to those defendants was a general charge covering negligence, whereas the jury was instructed specifically that J. D. & P. owed a duty as a possessor of land and Modern owed a duty as a bailor for hire and that a statutory duty was imposed upon both.

We believe that the absence of a specific duty charge resulted in no prejudice. The duties of Modern and J. D. & P. were mentioned because of their unique relationship toward plaintiff. The general negligence instruction, therefore, was sufficient to cover the relationship of other defendants. Moreover, the evidence upon which any negligence on their part could be based was simple and narrowly limited and was repeatedly pointed up in all of the summations by counsel. We are convinced that the jury was not misled and that mentioning some defendants more than others did not cause prejudice.

There remain only a few minor contentions, with which we can deal summarily. J. D. & P. contends that it was error to admit into evidence § 1.8 of the construction contract, by which J. D. & P. agreed to exercise reasonable care on the premises. In Foster v. Herbison Const. Co. 263 Minn. 63, 115 N. W. (2d) 915, we held that a contract provision of this type is admissible and may be considered by the jury as evidence tending to establish negligence. The court properly instructed the jury with respect to it and the broader language of this contract does not preclude its admission. We have considered J. D. & P.'s other assertions of error concerning admissibility of certain testimony, foreseeability, and the argument of plaintiff's counsel, and have found them without merit. So, also, is Modern's objection to the court's failure to submit the question of Stowe's negligence to the jury without merit.

■ We come now to the question of damages. In final argument, plaintiff's counsel asked the jury for damages of $714,000 and cautioned that in no event should they be less than $614,000. Included in the sum asked were $24,675 lost wages and $177,242 loss of future earnings computed at $700 a month for a life expectancy of 37.51 years. Also included were undisputed medical expenses of $29,000 and nursing care

of $3,964.80. Future medical care was $73,852 and future nursing was $55,786. Both future medical and future loss of wages were discounted to present value, computed at an interest rate of 3½ percent. Finally, the jury was asked for $150,000 for past pain and suffering and $200,000 for future pain and suffering.

The jury's verdict was for $642,400. The trial court reduced this to $375,000 on remittitur, which plaintiff accepted, but he now seeks to have the jury verdict reinstated. Modern and J. D. & P. contend that the jury verdict was so excessive that it must have been the result of passion and prejudice and therefore the entire trial was tainted. They also argue that damages, even after reduction to $375,000, are excessive.

It is difficult to understand how plaintiff can make an eleventh-hour appeal for reinstatement of the verdict. He filed a written consent to its reduction, and he failed to make a cross-appeal in this court. Under these circumstances, we must conclude that plaintiff is bound by his acceptance of the reduced award.

We do not believe that the verdict was the result of sympathetic emotion, rather than logic. The trial court makes this clear in its memorandum pointing out that the fault of the verdict most probably lies in the jury's acceptance of figures given it by plaintiff's counsel. Those basic figures used in computation, as the court remarks, did not take into account considerations that tend to decrease an award, and they were unrebutted by defense counsel, only one of whom argued damages at all. We agree with the trial court that the jury reached an excessive verdict by logical application of mathematical formulas that swelled the total sum beyond a reasonable figure.[16]

We will not disturb the trial court's determination. If plaintiff's computation of special damages and future medical and future earnings are believed, plaintiff received only $11,000 for past and future pain and suffering, including embarrassment and emotional distress. That sum is quite low and leaves a good deal of room for increase even if, as defend-

---

[16] See, McCrank v. G. N. Ry. Co. 260 Minn. 329, 109 N. W. (2d) 582; Ahlstrom v. Minneapolis, St. P. & S. S. M. R. Co. 244 Minn. 1, 68 N. W. (2d) 873; Hallada v. G. N. Ry. Co. 244 Minn. 81, 69 N. W. (2d) 673.

234

ants contend, the sums claimed for future medical care and future earnings are excessive. We therefore believe that the $375,000 set by the trial court should be upheld.

Affirmed.