Marlys SUTHERLAND, Trustee for
the Heirs of Rene Sutherland,
Decedent, Respondent,

v.

Tom BARTON, Defendant.

WALDORF CORPORATION, defendant
and third-party plaintiff, petitioner,
Appellant,

v.

MUSKA ELECTRIC CO., third party
defendant, Respondent.

No. C7–96–2018.

Supreme Court of Minnesota.

Oct. 23, 1997.

Michael S. Kreidler, Leo I. Brisbois, Stich, Angell, Kreidler, Brownson & Ballou, P.A., Minneapolis, for Appellant.

Thomas L. Garrity, Christenson & Stocco, Minneapolis, for Respondent Muska Electric Co.

Mitchell R. Spector, Abrams & Spector, P.A., Minneapolis, for Respondent Sutherland.

## OPINION

ANDERSON, Justice.

On Monday morning, January 30, 1995, Rene Sutherland was tragically killed in a workplace accident at the Waldorf Corporation paper plant in St. Paul, Minnesota. Sutherland was an employee of Muska Electric Company at the time of the accident. An experienced electrician, Sutherland was acting within the scope of his employment for Muska and under a contract for work that Muska was to perform for Waldorf. Following the accident, Marlys Sutherland, trustee for the heirs of Rene Sutherland, commenced a wrongful death action against Waldorf. After completing pretrial discovery, both parties moved for summary judgment. The Ramsey County District Court granted summary judgment dismissing the trustee's action against Waldorf. The district court determined that as a matter of law Waldorf owed no duty to Sutherland. A divided panel of the Minnesota Court of Appeals reversed the district court, concluding that Waldorf did owe a duty of reasonable care to Sutherland. We reverse and reinstate the district court's grant of summary judgment for Waldorf.

Waldorf Corporation operates a paper plant in St. Paul, Minnesota. Muska Electric Company is an electrical contractor that has routinely performed work for Waldorf at its St. Paul plant. Muska and Waldorf had an ongoing working relationship that began several years before Rene Sutherland's accident. In June 1988, Muska and Waldorf signed a contract for work that Muska was to perform at the Waldorf plant. This contract was to govern their relationship with each other, and it provided that Waldorf would issue separate work orders to Muska for each specific project. Under this contract, Muska was to "comply with all statutes, laws, ordinances, codes, rules and regulations applicable to the [w]ork, including Waldorf's policies, practices and rules for the jobsite." Muska also agreed to "provide competent supervision and direction" for all the work it performed.

Muska was continually working at Waldorf's St. Paul paper plant under the terms of the 1988 contract. Some Muska employees were at the paper plant on a permanent or almost permanent basis, and, at times, Muska and Waldorf employees worked together on projects. Dean McEnery, a Muska journeyman electrician, was permanently assigned as Muska's general foreman at the paper plant. McEnery directly supervised John Thoemke, Sutherland's foreman, and Tim Colestock, another Muska foreman.

In the fall of 1994, a specific project began involving the box board mills at the plant.

On this project, Muska was upgrading Waldorf's box board mills to convert the machinery controls to a computerized system. Waldorf employees did not work directly on this project nor were any Waldorf employees present at the time of Sutherland's accident. Several Waldorf employees were involved, however, in the planning and oversight of the project. Waldorf engineers Bud Stukel and Dan Capra were both involved in this planning. Capra was in charge of the instrumentation and control of the computer-regulated portion of the project. He worked on the layout and design of the instruments and cabinets with Thoemke.

In early December 1994, Thoemke attended a preconstruction meeting with McEnery and Stukel. At this meeting, the parties discussed whether it would be possible to shut down the power while Muska completed the box board mill project. Thoemke stated that it was clear from this meeting that the power at the plant could not be shut down for the project unless it was shut down for some other reason as well. Waldorf would have to shut down approximately one half of the plant in order to turn off the power in the project area. Following the meeting, McEnery and Thoemke concluded that the project could be completed safely with the power still on.

Muska and Waldorf employees continued to have regular contact as the box board mill project progressed. Capra was in contact with Thoemke on an almost daily basis. Stukel also met with Thoemke regularly to inquire as to the project's progress. In essence, Waldorf directed Muska to computerize the box board mills, and Muska decided how best to complete the project.

One specific task to be completed was to run one-inch metal conduit from Motor Control Center No. 8 (MCC–8) to a pull box.[1] Exposed buss bars[2] supplied an electrical current of 480 volts of power to MCC–8. Thoemke stated that these buss bars were suspended from the ceiling and could only be reached by use of a ladder. In order to run the conduit to the pull box, Muska employees needed to work within one foot of the buss bars. When Muska began this specific task, neither McEnery nor Thoemke asked Waldorf to shut off the power in the area. Both McEnery and Thoemke stated in their depositions that they believed the task of running metal conduit from MCC–8 to the pull box could be completed safely with the power still on. They were aware, however, of the dangers involved with working so near live buss bars. There was a general knowledge among Muska electricians that live buss bars could be deadly.

On the Friday afternoon preceding the accident, Thoemke met with Muska employees Doug Johnson and Russ Forga to discuss the specific task of running conduit from MCC–8 to the pull box and the necessary safety procedures to be followed. As a result of the meeting and as a safety precaution, Johnson and Forga wrapped insulation blankets around the exposed buss bars and placed yellow caution tape around the work area. McEnery stated that it was physically impossible to completely cover the buss bars. Early in the morning on the next workday, Monday, January 30, 1995, Thoemke met with Muska supervisors McEnery and Colestock to review the project. Because of the potential danger associated with this task, they decided that Forga, an electrician with only one year of experience, was too inexperienced to work near the live buss bars. They decided to replace Forga with Sutherland, a more experienced electrician.

Sutherland was 57 years old at the time of the accident and was a journeyman electrician with 30 years of experience. He had completed a four-year night school program, had undergone extensive training, and had passed two separate examinations to become licensed in his field. Sutherland was well aware of the danger of working near live buss bars. When working on a project at Waldorf in 1994, Sutherland pointed out to

---

1. A motor control center is an electric control that allows one to start a motor with the push of a button. A pull box is a metal box to which conduit is run; it serves as a distribution point for wires.

2. Buss bars are copper bars that conduct electrical energy.

Thoemke the danger inherent in live buss bars.

When Sutherland reported to work that Monday morning, Thoemke informed him that he was assigned to work with Johnson on the task of running wire from MCC–8 to the pull box. Thoemke reviewed the safety procedures of the job with Sutherland, the same safety procedures he had discussed with Forga and Johnson on the previous Friday afternoon. Thoemke pointed out to Sutherland the location of the live buss bars, and reminded him to be very careful even though the buss bars were wrapped in insulating blankets.

Later that morning, Sutherland stood on a ladder next to MCC–8. Using his metal measuring tape, Sutherland apparently began to measure for the length of conduit that he was to install. After inspecting the job site, McEnery concluded that Sutherland's metal measuring tape must have gotten behind the insulating blankets and touched the live buss bars. The 480 volts of electrical power set Sutherland on fire. Sutherland suffered a high voltage electric shock and died later that day of severe thermal injuries. After the accident, McEnery found the metal measuring tape with burn marks on it and part of the tape had burned away.

After the accident, in March 1995, the Minnesota Department of Labor and Industry (DLI) cited Muska for several OSHA violations involving Sutherland's accident. The DLI cited Muska for allowing an employee to use a metal measuring tape close to live buss bars and for failing to have an adequate safety program. More specifically, the DLI concluded that Muska's safety program failed to address the use of conductive materials around energized equipment or to address the hazard at this particular jobsite. The DLI did not cite Muska for failing to shut off the power while doing this work, nor did it cite Waldorf for any safety violations.[3]

In April 1995, Marlys Sutherland, as trustee for the heirs of Rene Sutherland, commenced a wrongful death claim against Waldorf. The trustee's theory of negligence is based upon the claim that the power should have been shut off when the work was done and that Waldorf had the authority to shut the power off and failed to do so for economic reasons. Waldorf filed an answer and pretrial discovery began. In January 1996, the trustee filed a motion for partial summary judgment and Waldorf filed a motion for summary judgment. In support of its motion, Waldorf claimed because Sutherland was an independent contractor's employee, Waldorf owed Sutherland no duty to supervise the work that he was performing or to warn him of the condition that caused the accident. The district court agreed and granted summary judgment to Waldorf, concluding that Waldorf owed no legal duty to Sutherland.

The trustee appealed. A divided panel of the court of appeals reversed the district court's grant of summary judgment to Waldorf. The court of appeals concluded that Waldorf owed Sutherland a duty, first, as the company hiring an independent contractor because it retained limited control over the project, and, second, as a landowner because it should have anticipated the harm despite the obvious nature of the danger. The court concluded, therefore, that summary judgment was improper as a matter of law. The court based its decision on Waldorf's personal liability for failing to shut off the power in the area where the box board mill project was to be completed.

On appeal to this court, Waldorf argues that it did not owe a duty to Sutherland because it did not retain detailed control over the box board mill project. Additionally, Waldorf argues that it is not liable as a landowner because the danger of live exposed buss bars was open and obvious, and the danger was such that it fell squarely within the field of expertise for which Waldorf had hired Muska.

I.

We first address the issue of Waldorf's liability to the employees of Muska, an independent contractor. A duty can be

3.  Sutherland's trustee claims that Muska was not cited for working with the power on because it did not have control over the power. The trustee also argues that the DLI did not cite Waldorf because it was not Sutherland's "employer" covered by OSHA.

based on either direct liability arising from a personal duty or vicarious liability arising from the relationship of the parties. Direct liability is the imposition of liability when one party has breached a personal duty to another party through his own acts of negligence. *See Conover v. Northern States Power Co.,* 313 N.W.2d 397, 401 (Minn.1981). In contrast, vicarious liability is the "imposition of liability on one person for the actionable conduct of another, based solely on a relationship between the two persons." Black's Law Dictionary 1566 (6th ed.1990).

This court has been hesitant to apply either direct or vicarious liability to a company hiring an independent contractor for injuries to that contractor's employees. This reluctance to hold a hiring company liable has been our consistent position for over 100 years. *See Schip v. Pabst Brewing Co.,* 64 Minn. 22, 24, 66 N.W. 3, 4 (1896). In *Schip,* we said that

> [t]here are many cases which hold that the owner of premises cannot, by employing a contractor, relieve himself from the continuing duty which he owes to the public * * * [b]ut we can find no case which holds that the owner owes any such duty to the servant of the independent contractor.

*Id. See also Conover,* 313 N.W.2d at 405 (stating that a company will not be liable for injuries to an independent contractor's employees specialized to do hazardous work for injuries resulting from that hazardous work), *citing with approval Vagle v. Pickands Mather & Co.,* 611 F.2d 1212, 1218 (8th Cir. 1979) (holding that a company does not owe a nondelegable duty to its independent contractor's employees).

### A. Direct Liability

■ There have been limited circumstances, however, when this court has been willing to hold a hiring company liable for injuries to an independent contractor's employees. For example, a company may be directly liable for its own personal negligence that causes injury to an independent contrac-

tor's employees. *Conover,* 313 N.W.2d at 401. In *Conover,* we held that a company may be found negligent when it retains detailed control over a project and then fails to exercise reasonably careful supervision over that project. *Id.*

Not just any amount of control by the hiring company is sufficient to impose direct liability. For liability to attach, the company must retain control over the "operative detail" of the work. Restatement (Second) of Torts § 414 cmt. a (1965). We implicitly adopted § 414 of the Restatement (Second) of Torts in *Conover,* 313 N.W.2d at 401 (citing *Thill v. Modern Erecting Co.,* 272 Minn. 217, 136 N.W.2d 677 (1965)). Section 414 provides that

> [o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

As a preliminary matter, we note that when applying the Restatement sections that impose liability on companies hiring independent contractors, we have held that "others" does not include the employees of an independent contractor.[4] *Conover,* 313 N.W.2d at 404. This limitation also applies to § 414. Nonetheless, the comments to § 414 are helpful in determining the requisite level of control necessary to warrant the imposition of liability to a company hiring an independent contractor. Comment c to § 414 defines the requisite level of control:

> It is not enough that [the company] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations * * *. There must be such a retention of a right of supervision

4. In *Conover,* this court dealt specifically with Restatement (Second) of Torts §§ 416, 424, 427 and 428 (1965). 313 N.W.2d at 403. We made reference to sections 416 to 429 of the Restate-

ment, however, in our conclusion that the term "others" in the "pertinent sections" of the Restatement did not include the employees of an independent contractor. *Id.* at 404.

that the contractor is not entirely free to do the work in his own way.

A hiring company must retain this level of control before we will hold it directly liable for injuries to an independent contractor's employees.

The district court found that Waldorf had only limited control over the box board mill project, held that Waldorf therefore owed no legal duty to Sutherland, and granted summary judgment to Waldorf. On review, we must determine if, based upon undisputed material facts, Waldorf did retain the requisite level of control necessary to warrant imposition of direct liability. The trustee argues that Waldorf did retain the requisite level of control by refusing or failing to shut off the electric power in the area where the box board mill project was to be completed. The court of appeals agreed with this argument and reversed the district court's decision.

■ It is undisputed that Waldorf had the right to order work stopped, to inspect its progress, to make suggestions, and to prescribe changes on the project. But this alone is not sufficient to impose liability. It is also undisputed that some weeks before Sutherland's work on MCC–8 and the pull box began, Muska foreman Thoemke did inquire of Waldorf about the possibility of shutting down the power to the project area. Based on this inquiry, Thoemke concluded that it would not be possible to de-energize the box board mill project area because it would be necessary to shut down the power to over one half the plant in order to do so. It was Thoemke's understanding that Waldorf would not shut off the power for the project unless it was to be shut down for some other reason as well. Nevertheless, Thoemke and Muska's general foreman McEnery both concluded that Muska could complete the project safely with the power still on.

Further, it is undisputed that Muska determined how to perform the specific task to which Sutherland was assigned the day of the accident. Muska determined how to protect the work area. It alone decided to insulate the buss bars and place yellow caution tape around the work area. More importantly, Muska did not insist that Waldorf shut off the power in the plant immediately before Sutherland proceeded with the specific task of running wire from MCC–8 to the pull box.

Muska was the independent electrical contractor; it was the specialist in electrical work. If Muska believed that it was necessary to shut off the power, it was in the position to explain to Waldorf that the project could not be completed safely unless the power was shut off. Muska could have told Waldorf that the power had to be shut off anytime its employees were to be working near live buss bars. Instead, Muska chose to let its employees move forward with running conduit to the pull box without telling Waldorf that the power needed to be shut off. Viewing the undisputed material facts of this case in the light most favorable to the trustee, we conclude that Waldorf did not retain the necessary detailed control over the box board mill project or the specific task that Sutherland was to perform to warrant the imposition of direct liability for Sutherland's fatal injuries. Waldorf is not directly liable to the trustee for the heirs of Rene Sutherland as a result of its leaving the electrical power on in the box board mill project area.

### B. Vicarious Liability

Sutherland arguably sought to hold Waldorf vicariously liable for the negligence of Muska. Holding a hiring company vicariously liable for the injuries of an independent contractor's employees would, as we said in *Schip*, "go far towards making an independent contractor a mere foreman, for whose acts the [hiring company] is liable." 64 Minn. at 26, 66 N.W. at 5. Moreover, we have only been willing to apply vicarious liability to a hiring company in this situation when the company retains detailed control over the specific project on which the employees are working. *Nepstad v. Lambert*, 235 Minn. 1, 16, 50 N.W.2d 614, 622 (1951).

We have already concluded that the district court correctly found that Waldorf did not retain the necessary detailed control over the box board mill project as a whole or over the specific task of running conduit from MCC–8 to the pull box in order to impose

direct liability. We also conclude that Waldorf did not retain the requisite detailed control over the work it hired Muska to perform to warrant the imposition of vicarious liability. To impose vicarious liability for Sutherland's electrical injuries would be especially inappropriate when Waldorf hired Muska specifically because Muska had expertise in electrical work. As we have stated before in *Conover*, "one who hires an independent contractor with employees specialized to do the hazardous work should not be penalized by being held vicariously liable for an injury to those employees." 313 N.W.2d at 405.

## II.

We next address the issue of Waldorf's duty as a landowner to Sutherland as a business invitee at the Waldorf plant. Landowners have a duty "to use reasonable care for the safety of all such persons invited upon the premises." *Peterson v. Balach*, 294 Minn. 161, 174, 199 N.W.2d 639, 647 (1972). As a landowner, a company may be directly liable, "as a possessor of land, to persons coming on the premises, including the employees of an independent contractor." *Conover*, 313 N.W.2d at 401. Landowners are not, however, liable for harm caused by known or obvious dangers unless the landowner should anticipate the harm despite its obvious nature.

This court has adopted § 343A of the Restatement (Second) of Torts (1965) which states that landowners are not liable to their invitees for harm caused by dangers that are "known or obvious" to those invitees. *Baber v. Dill*, 531 N.W.2d 493, 496 (Minn.1995); *Peterson v. W.T. Rawleigh Co.*, 274 Minn. 495, 496–97, 144 N.W.2d 555, 557 (1966). Sutherland knew of the danger involved in working near exposed live buss bars. He was a licensed electrician with 30 years of experience. He had worked near live buss bars before and in fact had warned others of the danger inherent in such a task. On the day of the accident, his supervisor specifically pointed out the live buss bars to Sutherland. There is no dispute that the danger was known and obvious to Sutherland. Indeed, the trustee's attorney specifically pointed out at oral argument that this is not a duty to warn case because the danger was known and obvious.

However, even if a danger is known and obvious, landowners may still be liable to their invitees if they "should anticipate the harm despite such knowledge or obviousness." Restatement (Second) of Torts § 343A (1965). This language is a crucial qualifier to the general rule. *Adee v. Evanson*, 281 N.W.2d 177, 179 (Minn.1979); *W.T. Rawleigh Co.*, 274 Minn. at 497, 144 N.W.2d at 557–58. A reason to anticipate the harm may arise when the landowner "has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk." Restatement (Second) of Torts § 343A cmt. f (1965).

The trustee argues that Sutherland's only alternative to avoiding the risk of the live buss bars was to forgo his employment; therefore, the advantages of encountering the danger outweighed the apparent risk. But Sutherland did have alternatives other than completely avoiding the risk or forgoing his employment: namely, to refrain from using a metal tape measure near live buss bars. The DLI specifically determined that it was unsafe for Muska to allow Sutherland to have the metal tape near the live buss bars. More importantly, Sutherland had expertise as an electrician. This expertise was the exact reason Waldorf hired Muska to perform the box board mill project. Sutherland was trained to work near energized electrical wires. It was entirely reasonable for Waldorf to expect that Muska, as a company specializing in electrical work, would take the necessary safety precautions and would require its employees to follow proper safety guidelines. Accordingly, Waldorf had no reason to anticipate that Muska, its independent contractor, and Sutherland, its contractor's employee, would proceed to encounter the danger of the live buss bars without taking the necessary safety precautions. Waldorf did not owe Sutherland a duty to protect him from harm by this known and obvious danger.

We conclude that as a matter of law Waldorf owed no duty to Sutherland, an indepen-

dent contractor's employee. We reverse the court of appeals and reinstate summary judgment for Waldorf.

Reversed.