Wayne IEPSON, Appellant,

v.

Randy NOREN, et al., Respondents,

Vernon Lehman, Defendant.

No. 51355.

Supreme Court of Minnesota.

Aug. 7, 1981.

Charles C. Halberg, Burnsville, for appellant.

Lommen, Nelson, Sullivan & Cole, Mark N. Stageberg and Wells H. Anderson, Minneapolis, for respondents.

SCOTT, Justice.

This is an appeal in an action arising out of a head-on collision between a motor bike driven by the appellant and a pickup truck. There were four defendants in the lower court action: one owned the truck; one loaned the truck; one drove the truck; and one owned the land on which the collision took place. The action against the landowner, Victor Lehmann, was settled prior to trial.

The case was tried to a jury on December 17–19, 1979, in Anoka County District Court. At the close of evidence, the court directed a verdict for the three remaining defendants, concluding that there had been a primary assumption of risk by the plaintiff and that the plaintiff had been more negligent than each and all of the defendants.

The district court subsequently denied plaintiff's motion for a new trial, and entered judgment dismissing plaintiff's action and awarding $702.75 to the truck owner, Rehbein Transit Inc., on its counter-claim. From the judgment and the order denying a new trial, the plaintiff motor-bike driver appeals to this court, requests a reversal of the judgment and order, and asks that the case be remanded for a new trial. We agree and reverse.

Most of the crucial facts are in dispute. We present the facts here in the light most favorable to appellant in order to facilitate a determination of whether appellant's negligence, as a matter of law, exceeded that of each and all of the respondents.

At about 7:30 p. m. on September 2, 1975, appellant, 16-year-old Wayne Iepson, went for a drive on his motor-bike, a four-speed, 125 cc Kawasaki, specifically designed for riding on dirt trails. Throughout appellant's neighborhood in Lino Lakes there are interconnecting trails. Some of the trails traverse a 34-acre, densely wooded plot owned by Vernon Lehmann. Appellant and other youths often rode their motor-bikes on the trails traversing Lehmann's property. Iepson testified that he had once asked and received oral consent from Mr. Lehmann's son, Kenny, to ride those trails.

On this particular evening after appellant rode about for a half hour (or until about 8:00 p. m.) he noticed, and pulled over to talk to, some of his high school friends at a campsite in a little clearing in the woods. During the conversation one friend, Donny, asked and received permission from Iepson to take a ride on the motor-bike. Donny rode south and then turned west and went by the house owned by the Rehbeins. There the Rehbeins' German Shepherd chased after the motor-bike, and Donny took a spill on the bike on the Rehbeins' driveway. Donny rode the bike back to the campsite, and told Iepson about the spill and asked him to check over the bike.

The time was then between 8:30 and 8:45 p. m.; it was late twilight or dusk in the woods, and only a little less dark at the Rehbeins' house where 16-year-old respondent Randy Noren, and his friend, Todd Truman, had decided they wanted to drive a pickup truck into the woods. They asked their older friend, respondent Reid Rehbein, a 27-year-old employee of respondent Rehbein Transit, Inc., if they could borrow the company-owned, new pickup truck that he used on and off work. Reid consented.

The two boys, with Noren driving, headed east in the pickup truck, taking what appears to have been the same route as Donny took only a short time earlier when he returned to the campsite after his spill. Their testimony on their reasons for wanting to go into the woods and what they intended to do there is internally inconsistent and is contradicted by a statement made by one of them to a police officer soon after the accident in controversy. Truman testified that they went out to look for firewood that had been cut into logs and arranged in several separate piles. He testified that the wood piles were 10 to 25 feet off the trails and into the woods. Truman further testified that he and Noren were looking for one certain pile. When asked repeatedly to explain what was special about the log pile they were supposedly seeking, Truman gave evasive and inconsistent answers that a jury could reasonably have found to lack credibility.

In the supposed search for a certain pile of logs, the youths drove due east, turned, went due north a while and then stopped. At that point respondent Noren turned off the lights. Noren put the truck in park, but left the engine running. Truman then left the truck to find the special pile of logs and, though it was dark, made his search without aid of the truck's lights. One glance sufficed in this search; the first pile he spotted in the dark was not special but,

for no reason, that had ceased to be important. He then rejoined Noren in the cab of the truck.

Noren and Truman then chatted for a minute in the truck. They were parked approximately fifty yards south of the campsite where local youths often gathered. Truman testified that the windows of the truck were up. Noren testified that the windows were down. Both testified that they heard nothing and saw nothing except, for an instant, there was a blur just in front of the truck and an engine roar, and then the sound of an impact on the passenger side of the truck as the collision occurred.

In Iepson's version, when his friend Donny returned the bike, Iepson checked it, tried the light, found it would not go on, and decided to ride home without the light. He started the bike and headed south on the trail. As he was shifting gears from second to third, at a speed he estimated as between 20 and 30 miles per hour, he saw a blob appear in front of him, traveling toward him; too late he realized it was a truck moving toward him. He tried to avoid it, but collided with it.

One of the youths at the campsite, Shane Miller, testified that he had watched Iepson ride off. He lost sight of him momentarily in the dark, but never ceased hearing the engine of the dirt-bike. Suddenly, he saw the dirt-bike's brakelights go on, heard a collision and scream, and then saw a truck's brakelights go on.

After the collision, the youths at the campsite ran down to the place of the accident, arriving only a few moments after it occurred. Truman and defendant Noren got out of the truck and headed back to the Rehbein home, where they informed Reid Rehbein that there had been an accident. Rehbein accompanied them back to the site of the accident. When the police arrived they questioned Rehbein, Noren, and Truman. One of the police officers, Salvatore J. Costa, insisted that he clearly remembered being told by someone, who gave the name Reid Rehbein, that what happened was: "Well, there's always these field parties here in the field and we were sneaking up on them."

Iepson suffered several compound fractures of the right leg. He brought an action for personal injury against respondents Noren, Rehbein, Rehbein Transport, Inc., and Lehmann. After both sides had presented evidence to the jury, the district court granted a directed verdict to respondents, holding that appellant's conduct constituted a primary assumption of risk and involved more negligence than that of the respondents, individually or taken together.

The following issues are thereby presented:

(1) Did the trial court err in granting a directed verdict partly upon a finding that the appellant's conduct constituted a primary assumption of risk?

(2) Did the trial court err in granting a directed verdict partly on the finding that appellant's conduct constituted more negligence than that of the respondents?

(3) Did the trial court err in directing a verdict on the counterclaim for property damage in favor of respondents?

■ 1. Appellant argues that the criteria set by this court for primary assumption of risk were not met by his alleged negligent conduct. We agree. In *Springrose v. Willmore*, 292 Minn. 23, 192 N.W.2d 826 (1971), this court indicated that primary assumption of risk "relates to the initial issue of whether a defendant was negligent at all—that is, whether the defendant had any duty to protect the plaintiff from a risk of harm. It is not, therefore, an affirmative defense." *Id.* at 24, 192 N.W.2d at 827. Before primary assumption of the risk is applicable:

*There must first of all, of course, be some manifestation of consent to relieve the defendant of the obligation of reasonable conduct. It is not every deliberate encountering of a known danger which is reasonably to be interpreted as evidence of such consent.*

The jaywalker who dashes into the street in the middle of the block, in the path of a stream of cars driven in excess of the speed limit, certainly does not

manifest consent that they shall use no care and run him down. On the contrary, he is insisting that they shall take immediate precautions for his safety * * *.

W. Prosser, *Handbook of the Law of Torts* § 68 (4th ed. 1971) (emphasis added). Appellant never consented to relieve the respondents of their obligation to act with due care. As in *Bakhos v. Driver,* 275 N.W.2d 594, 595 (Minn.1979), "[t]he continued existence of this duty makes the defense of primary assumption of risk inapplicable to this case." [1]

■ 2. The issue of whose negligence was the greater is far from clear and should have gone to the jury. Appellant admits to riding above 20 m.p.h. at dusk on a trail quite familiar to him. Whether such conduct constitutes negligence is a question for the jury to resolve.

■ Similarly, whether Truman and Noren were negligent also is a jury issue. Both knew that cyclists often rode the trails. A jury could infer that they knew of the presence of a cyclist only shortly before driving into the woods because the youth who had borrowed appellant's dirt-bike had just taken a spill behind the Rehbein house. One witness, Shane Miller, testified that there was a campfire burning at the campsite; a jury could infer that at dusk even a low fire would be quite visible from high in a pickup truck's cab only 50 yards away. As the police officer testified, the two youths "were trying to sneak up" on the other youths at the campsite. A jury could reasonably have found that this attempt to "sneak up," rather than the mythical "special pile of wood," explains the truck's being located 50 yards south of the campsite and proceeding with its lights off.

Sound, rather than sight, however, seems to be the crucial factor in this case. The sound of a new pickup truck's engine when idling or at a low speed can be soft and low, and not necessarily discernible at a distance of 50 yards. The sound of a heavily used dirt-bike's engine is a loud growl when it starts up, and it grows louder and louder as the bike accelerates. Respondent Noren testified that the truck's windows were open. A jury could reasonably infer that despite their denials, Noren and Truman heard the dirt-bike motor start, and heard the bike come the entire 50 yards prior to the collision. A jury could reasonably conclude that respondent Noren had time to turn on the truck's lights, time to honk the horn, and that both he and Truman had time to put their heads out the open windows to yell a warning. A jury might well wonder why Truman and Noren sat quietly still in a truck with its lights off, hidden in the dark and blocking the trail, when they, rather than appellant, knew and appreciated the risk. Had a heavy vehicle been loudly approaching them without lights at over 20 m. p. h., one doubts that they would have sat so quietly. The issue of comparative negligence should have gone to the jury.

■ 3. Appellant argues that the negligence of respondent (employee) Reid Rehbein and respondent (non-employee) Randy Noren should be imputed to employer Rehbein Transit, Inc. Respondents correctly note that since the relationship between Reid Rehbein and Randy Noren was, with respect to the use of the truck, that of bailor-bailee, the negligence of bailee Noren cannot be imputed to Rehbein Transit through bailor Rehbein, owing to this court's decision in *Weckerly v. Abear,* 256 N.W.2d 79, 82 (Minn.1977). That, however, does not prevent an imputing of Reid Rehbein's negligence to his employer, and thus the jury should have been allowed to determine the comparative negligence with respect to the counter-claim. If a jury found that Rehbein knew Truman and Noren planned to use the truck to "sneak up on" a party of other youths, it might well have

1. Whether secondary assumption of risk is applicable is an issue not presently before this court. We note, however, that secondary assumption of risk was merged with comparative negligence under our decision in *Springrose.*

Therefore, any question of secondary assumption of risk must be resolved by the jury in their answers to the comparative negligence interrogatory.

allowed Rehbein Transit much less than the $702 awarded by the district court. This issue, too, should have gone to the jury.

We therefore reverse and remand the case for a new trial.