# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.  02-1554
_____

| | |
|---|---|
| Robert Reimer, Susan Reimer, individually and as husband and wife, | * * * |
| Plaintiffs - Appellants, | * |
| v. | * Appeal from the United States * District Court for the District * of Minnesota. |
| City of Crookston, Crookston Public School District #593, Johnson Controls, Inc., KRISS Premium Products, Inc., | * * * * * |
| Defendants - Appellees. | * * |

_____

Submitted: October 11, 2002
Filed:  April 10, 2003
_____

Before LOKEN,[1] Chief Judge, BEAM, and MELLOY, Circuit Judges.
_____

MELLOY, Circuit Judge.

In March, 1998, Robert Reimer was severely burned while examining a low-

_____

[1]The Honorable James B. Loken became Chief Judge of the United States Court of Appeal for the Eighth Circuit on April 1, 2003.

pressure boiler used to heat a swimming pool owned by the Crookston Public School District ("School District") and jointly operated with the City of Crookston ("City"). At the time of the accident, Mr. Reimer was an employee of Gibb & Sons, Inc., a boiler repair company. In this diversity action, Mr. Reimer and his wife sought damages based on the alleged negligence of the School District, the City, and two companies, Johnson Controls, Inc., and KRISS Premium Products, Inc. ("KRISS"), which serviced the pool facilities pursuant to contracts.

The district court granted summary judgment to all the defendants, holding they owed no duty of care to Mr. Reimer because his injury resulted from an open and obvious danger. Alternatively, the district court held that Mr. Reimer assumed the risk of his injury when he agreed to examine the boiler. After a careful review of Minnesota law in this area, we affirm in part and reverse in part. We agree that Johnson Controls and KRISS owed no duty of care to Mr. Reimer. As to the School District and City, however, we find genuine issues of material fact preclude summary judgment in their favor.

I.

This case involves a serious accident which occurred when Mr. Reimer, the plaintiff-appellant, was examining a school swimming pool boiler that reportedly was leaking. While Mr. Reimer was conducting an ultrasound test on the boiler, his knee accidentally brushed up against a corroded pipe, or "nipple," which was screwed into the boiler vessel via a welded fitting hole called a "bunghole."[2] The corroded nipple broke off and Mr. Reimer was severely burned over much of his body. Few facts remain uncontested by the parties. For summary judgment purposes, however, we

---

[2] When the boiler is drained, the nipple is unscrewed and removed so that water can flow freely out of the boiler through the bunghole.

recite the facts in the light most favorable to Mr. Reimer. <u>Offerdahl v. Univ. of Minn. Hosps. & Clinics</u>, 426 N.W.2d 425, 427 (Minn. 1988).

The Crookston municipal swimming pool is jointly operated by the City and School District pursuant to a joint powers agreement. The School District owns the pool building and boiler, and is responsible for "routine maintenance and boiler checks." <u>See</u> Financial Responsibility Statement, City Supp. App. at 92. "Major capital expenses associated with maintenance, repair and replacement" of pool related items (such as, e.g., pumps, water filtration system, plumbing) are shared by the two entities, as are "major building improvements and equipment purchases." <u>See</u> <u>id.</u> Significant decisions concerning the boiler at the pool are subject to final authorization by the Board of Education. The School District has a contract with Johnson Controls to provide some maintenance services for the swimming pool boiler and other boilers at School District facilities. KRISS supplies boiler water chemicals to the swimming pool.

At some point during the 1997-98 school year, Ken Stromberg, the pool director, noticed some moisture on the floor of the boiler room near the rear left side of the boiler. Mr. Stromberg informed Ray Nelson and Bill Brinkman of his observation. Mr. Nelson was the head custodian in charge of the pool facilities, including the boiler, and, as such, was a licensed boiler engineer. Mr. Brinkman was the School District's business director. Mr. Nelson called Mr. Reimer at Gibb & Sons and told him that the pool boiler was "leaking in the tubes," and that "there was a leak in the back of the boiler."[3] Mr. Reimer had worked for Gibb & Sons for about ten

---

[3] According to Mr. Reimer, the fact that internal tubes in the boiler were leaking did not suggest any sort of extraordinary problem. Reimer aff. at ¶ 5-6. Rather, Mr. Reimer avers, these tubes are often replaced several times during the life of a boiler because the tubes' walls are thinner than any other elements on the boiler. <u>Id.</u>

years and was considered to be a boiler repair expert. His duties included troubleshooting on commercial boilers.

Some time passed before Mr. Reimer could get to the school to follow up on Mr. Nelson's phone call. The parties dispute how long this period was, perhaps as long as months. In the meantime, it is assumed that the boiler continued to leak.

On the afternoon of March 10, 1998, John King of Johnson Controls was at the Crookston swimming pool for contract-related maintenance work. He testified that during his visit Mr. Nelson asked him to tighten the nipple located on the lower left rear of the boiler which, according to Mr. King, was "dripping a little bit or a little wet." King dep. at 76. Mr. King refused to tighten the nipple because it was corroded and appeared unsafe. He could not say precisely how much corrosion was visible but it was "enough to know that it wasn't something to put a wrench on." Id. at 75.

That evening at seven p.m., Mr. Reimer arrived to examine the boiler. Based on Mr. Nelson's suspicion that the boiler needed retubing, Mr. Reimer had brought along ultrasound equipment. An ultrasound test is a diagnostic procedure which measures the integrity of the metal comprising the boiler vessel. With this information, Mr. Reimer could advise the School District as to whether retubing the boiler would suffice or whether the boiler should be completely replaced.

It is not necessary that the boiler be "hot" or operational for the ultrasound test to be effective. An ultrasound works equally well on a cold, or even empty, boiler. In this instance, Mr. Reimer did not direct Mr. Nelson to cool down the boiler prior

to beginning the examination.[4] To conduct the test, Mr. Reimer and Mr. Nelson first pulled back an outer sheet metal cover so that the boiler vessel itself was accessible. Then, while Mr. Nelson held a "trouble light," Mr. Reimer selected several spots on the boiler vessel to lightly "grind down" in order to remove any rust and millcoat, thereby providing a smooth surface for testing.[5] One of the spots he chose was relatively close to the nipple on the lower left rear of the boiler. At one point, while grinding in this area, Mr. Reimer felt that he did not have complete control of the grinder. He attempted to reposition himself and, in so doing, his left knee accidentally brushed against the corroded nipple. This caused the nipple to break out of the bunghole, releasing the pressurized hot water and steam from inside the boiler. As a result, Mr. Reimer sustained scalding water and steam burns over sixty-seven percent of his body.

Mr. Reimer and his wife sued the School District, the City, Johnson Controls and KRISS, alleging their negligence led to his injury. The district court granted the defendants' motions for summary judgment. This appeal followed.

## II.

"Summary judgment is appropriate only when there is no genuine issue of

---

[4] Once the boiler was turned off, it would have taken several hours to cool down.

[5] Mr. Reimer describes the ultrasound test as a "noninvasive" procedure because it does not entail contact with the interior of the boiler. Reimer aff. at ¶ 13. We think it prudent to note that whether the ultrasound test is properly deemed noninvasive is a question of fact subject to jury determination. For purposes of summary judgment, however, we accept Mr. Reimer's characterization of the procedure. See Offerdahl, 426 N.W.2d at 427.

material fact and the moving party is entitled to judgment as a matter of law." Viking Supply v. Nat'l Cart Co., 310 F.3d 1092, 1095 (8th Cir. 2002). "We review a district court's grant of summary judgment de novo, giving the nonmoving party the most favorable reading of the record as well as the benefit of [all] reasonable inferences that arise from the record." Gentry v. Georgia-Pacific Corp., 250 F.3d 646, 649 (8th Cir. 2001). In a diversity case, we also review de novo the district court's interpretation and application of state law. Viking Supply, 310 F.3d at 1096. In this diversity matter, Minnesota law guides our analysis of the substantive claims. See Bennett v. Hidden Valley Golf and Ski, Inc., 318 F.3d 868, 874 (8th Cir. 2003) ("In a diversity case . . . we must follow state law as announced by the highest court in the state.") (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

Essential to any negligence claim is the breach of a duty of care owed to the plaintiff. See Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995) (listing elements of negligence claim). The district court held as a matter of law that none of the defendants owed a duty of care to Mr. Reimer, and, alternatively, that Mr. Reimer assumed the risk of his injury. We will discuss each of these holdings in turn.

## A. Duty

Whether a legal duty exists is generally a question of law to be determined by the court. ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 307 (Minn. 1996); Gabrielson v. Warnemunde, 443 N.W.2d 540, 543 n.1 (Minn. 1989). However, where the existence of a duty turns upon contradicted facts, those facts must be submitted to a jury for resolution prior to the court's legal conclusion on the issue. Id.; Johnson v. Urie, 405 N.W.2d 887, 891 n.5 (Minn.1987).

1.    The School District and City of Crookston: landowner liability.


At issue in this case is the duty owed by a possessor of land to the employee of an independent contractor.[6] The duty imposed on a possessor of land who hires an independent contractor is to inspect the premises for latent or hidden dangers and then to warn oncomers of those dangers. Conover v. N. States Power Co., 313 N.W.2d 397, 401 (Minn. 1981). That duty extends to employees of independent contractors hired by the landowner. Id. Although the School District owned the pool building and the boiler, a written agreement with the City supports a finding, for summary judgment purposes, that the parties jointly operated the facilities and jointly shared the indices and liabilities of ownership. Accordingly, although our discussion will focus on Mr. Reimer's case against the School District, our analysis and conclusions with regard to that defendant apply equally to the City.


In determining a landowner's duty, Minnesota applies the rule set forth in Section 343A of the Restatement (Second) of Torts. As explained by the Minnesota Supreme Court in a slip-and-fall case, Peterson v. W.T. Rawleigh Co., 144 N.W.2d 555 (Minn. 1966):


> In support of its contention that it violated no duty toward the plaintiff, defendant asserts . . . that it is not liable for injuries caused by defects

---

[6] Liability for injury to an employee of an independent contractor may also be imposed where the landowner "retain[s] 'the general control and supervision of the work.'" Zimmer v. Carlton County Co-op Power Ass'n, 483 N.W.2d 511, 514 (Minn. Ct. App. 1992) (quoting Thill v. Modern Erecting Co., 136 N.W.2d 677, 684 (Minn. 1965)). The district court found no basis for retained control liability as Mr. Reimer concedes he was in charge of all aspects of, and decisions pertaining to, examination of the boiler on March 10, 1998. Mr. Reimer did not challenge this aspect of the district court's decision.

which were obvious to, and comprehended by, plaintiff. We think the better rule is that adopted by Restatement, Torts (2d) s 343A, as follows:

> '(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *Unless* the possessor should anticipate the harm despite such knowledge or obviousness.'

W.T. Rawleigh, 144 N.W.2d at 557 (footnote omitted and emphasis added);[7] see also Louis v. Louis, 636 N.W.2d 314, 319 (Minn. 2001) (reaffirming Minnesota's adoption of the rule set out in Restatement (Second) of Torts § 343A); Baber v. Dill, 531 N.W.2d 493, 496 (Minn. 1995) ("Thus, even for obvious dangers, a possessor has a duty to warn if harm to an invitee should be anticipated despite the obviousness of the danger.").

The Minnesota Supreme Court has characterized Section 343A's "unless" clause as "a crucial qualifier to the general rule." Sutherland v. Barton, et al., 570 N.W.2d 1, 7 (Minn. 1997) (citing Adee v. Evanson, 281 N.W.2d 177, 179 (Minn. 1979), and W.T. Rawleigh, 144 N.W.2d at 557-58). However, liability under this clause does not attach "where the anticipated harm involves dangers *so obvious* that no warning is necessary . . . ." Baber, 531 N.W.2d at 496 (emphasis added). As

---

[7] In a subsequent case, the Minnesota Supreme Court held that the distinction between licensees and invitees was no longer determinative of the duty owed by landowners to entrants, although the status of the entrant may be a factor in assessing negligence. Peterson v. Balach, 199 N.W.2d 639, 647-48 (Minn. 1972). The court concluded that a landowner has a duty of reasonable care for the safety of all entrants other than trespassers. Id. at 642, 647. See also Conover, 313 N.W.2d at 402 ("As the possessor of land, [the landowner] ha[s] a duty to use reasonable care under the circumstances then existing, without regard to whether the entrant is a licensee or invitee.") (citing Balach, 199 N.W.2d 639).

acknowledged by the supreme court in Baber, "The difference between open and obvious dangerous activities and conditions for which the possessor should anticipate harm and those activities and conditions for which the possessor should not anticipate harm because they are so open and obvious is a fine one, but one that we choose to make." Id.

Following these principles, Mr. Reimer's appeal turns on: (1) whether a reasonable jury could find that the corrosive nipple was a latent or hidden danger (rather than a known or obvious danger) so that the School District had a duty to warn Mr. Reimer about it; *or* (2) even if the dangerous condition presented by the corroded nipple was known or obvious, whether a reasonable jury could find that the Section 343A exception conditions are met; i.e., that the School District should have anticipated the harm despite the known or obvious danger.

The district court concluded that Mr. Reimer's injury was caused by an obvious danger, about which the defendants owed no duty to warn. The district court cited the following facts in support of this conclusion: "Reimer saw that the boiler nipple was badly corroded, and Reimer knew that the boiler was leaking. Reimer was a boiler repair expert hired specifically to investigate the problem of the leaking boiler. The suspect integrity of the boiler posed an inherent danger." Reimer v. City of Crookston, et al., No. 00-370, slip op. at 7 (D. Minn. Jan. 16, 2002). Mr. Reimer argues that evidence in the record refutes the district court's finding of obviousness. First, he points to his own testimony that the nipple's corrosion was not of a type or magnitude that would have alerted him to the possibility of the nipple breaking off. And second, he relies on an expert affidavit which opined that the corrosion would have been much worse on the less visible underside of the nipple than the top and sides.

Testimony and evidence regarding Mr. Reimer's subjective observations are not instructive on the issue of obviousness. "[T]he test for what constitutes an 'obvious' danger is an objective test: the question is not whether the injured party actually saw the danger, but whether it was in fact visible." Louis, 636 N.W.2d at 321 (citing Munoz v. Applebaum's Food Market, Inc., 196 N.W.2d 921, 922 (Minn. 1972)). Given Mr. Reimer's testimony that he saw corrosion on the nipple, and his experience and expertise in the field of boiler repair, we agree that the record irrefutably establishes that the condition and risk were objectively obvious. See Restatement (Second) of Torts § 343A, cmt. b (1965)) (explaining that obviousness determination is made from the perspective of a reasonable person "in the position of the visitor, exercising ordinary perception, intelligence and judgment").

Our analysis does not end there, however. There is nothing in the record to conclusively indicate that the dangerous condition in this case was "so obvious" as to preclude application of Section 343A's "unless" clause, and genuine issues of material fact remain as to whether the School District should have anticipated the harm to Mr. Reimer. See, e.g., Louis, 636 N.W.2d at 322 (requiring consideration of "unless" clause applicability even where known or obvious condition found as a matter of law). Viewing the evidence in the light most favorable to Mr. Reimer, this court must accept the following as true: (1) in the course of examining the boiler, Mr. Reimer saw a nipple with some corrosion on it but no more than he had seen on many occasions on similar boilers; (2) the corrosion on the nipple was more severe on the underside of the nipple, close to the bottom of the boiler, than on the top and sides where Mr. Reimer was more likely to focus given the task he was performing; (3) conducting an ultrasound does not entail contact with the interior of the boiler or with the nipples or bungholes on the boiler; (3) Mr. Nelson was aware that the nipple was corroded because only hours earlier a Johnson Controls employee refused his request to tighten the nipple because of its corroded and dangerous state; (4) Mr. Nelson understood the gravity of the danger posed by a nipple with this degree of corrosion

because he is a licensed boiler engineer; (5) Mr. Nelson saw Mr. Reimer working in close proximity to the nipple on a procedure that would not necessarily call his attention to the state of the nipple; and (6) Mr. Nelson did not warn Mr. Reimer about the corroded nipple or tell him about the concerns raised by Johnson Controls just hours earlier. On these facts, the School District, through its agent, Mr. Nelson, could reasonably anticipate that Mr. Reimer would proceed with the noninvasive ultrasound without making a careful assessment of the condition of the nipple.

The School District disputes most of the above-recited facts. In our view, such factual disputes are precisely of the type that preclude summary judgment resolution. And contrary to appellees' contention, our holding is consistent with Sutherland v. Barton, et al., a Minnesota Supreme Court case with some factual similarities. 570 N.W.2d 1 (Minn. 1997). In Sutherland, an independent contractor-electrician was killed while using a metal tape measure near exposed live buss bars. Id. at 4. It was undisputed that Sutherland "had worked near live buss bars before and in fact had warned others of the danger inherent in such a task." Id. at 7. Moreover, "[o]n the day of the accident, his supervisor specifically pointed out the live buss bars to Sutherland." Id. The supreme court affirmed the district court's grant of summary judgment to the employer. See id. at 7-8. The court found that the danger posed by the live buss bars was open and obvious, that the risk could have been avoided by turning off the electricity, and that this was not a case where the employer should have anticipated that the plaintiff would fail to appreciate the risk involved in using a metal tape measure near live buss bars. See id. at 7.

As in Sutherland, the plaintiff here had expertise in his field and alternatives other than confronting the risk. It is undisputed that Mr. Reimer could have ordered Mr. Nelson to turn off the boiler and let it cool overnight prior to examining it. However, these facts alone are not sufficient to find as a matter of law that no duty existed. The relevant inquiry remains whether under the circumstances the School District should have anticipated harm.

-11-

As explained by the <u>Sutherland</u> court: "A reason to anticipate the harm may arise when the landowner 'has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.'" <u>Sutherland</u>, 570 N.W.2d at 7 (quoting Restatement (Second) of Torts § 343 cmt. f (1965)); <u>see also</u> <u>W.T. Rawleigh</u>, 144 N.W.2d at 557-58 (characterizing comment f of Section 343A as "well summariz[ing]" the court's view). We see a significant qualitative difference between the risk posed by using a metal tape measure near live buss bars, as in <u>Sutherland</u>, and conducting what is expected to be a noninvasive diagnostic procedure on a closed boiler as in the case at bar. Here, a jury could reasonably find that the apparent risk did not necessarily warrant the alternative–turning off the boiler. <u>See</u> <u>Conover</u>, 313 N.W.2d at 402 (finding that a jury could properly conclude that routine inspection procedures of independent contractors would not have revealed the particular condition that caused harm and would not be reasonably expected to do so). We also note an important factual distinction between <u>Sutherland</u> and the instant case. It was undisputed in <u>Sutherland</u> that the plaintiff was explicitly warned about the dangerous condition that caused his injury–both prior to and on the very morning of his injury. <u>See</u> <u>Sutherland</u>, 570 N.W.2d at 7; <u>see also</u> <u>Hamm v. Oak Park Lutheran Church</u>, No. CX-02-354, 2002 WL 31171760 (Minn. Ct. App.) (unpublished) (affirming grant of summary judgment in favor of defendants where plaintiff who was electrocuted by power wires knew of the danger of using a crane near power wires and "the record shows that [plaintiff was] made aware of the power lines before beginning work that day). In this case, there are significant fact disputes regarding Mr. Reimer's actual knowledge of the dangerous condition, even if it was objectively obvious. Thus, while both Mr. Reimer and Mr. Nelson were licensed boiler engineers, only one–the School District's Mr. Nelson–had particularized information that may have shifted the balance in the Restatement § 343A analysis. No analogous scenario existed in <u>Sutherland</u>.

Given the conflicting evidence in the record as to what Mr. Reimer and the School District knew or should have known at the time of the accident, we conclude

it is for a jury to determine whether this case falls within the "unless" clause of Restatement § 343A. Construing the record favorably to Mr. Reimer, the evidence is sufficient to establish that the School District, through its agent, Mr. Nelson, should have anticipated that Mr. Reimer might fail to appreciate the dangerous condition posed by the corroded nipple and be injured while examining the boiler. Accordingly, the record will not permit a summary judgment finding that the School District lacked a duty of care to Mr. Reimer. Because we deem the City joint owner-operators of the pool facilities, our conclusion on this issue applies equally to the City.

2.      Johnson Controls and KRISS:

Absent landowner status, the existence of a legal duty to act depends on two factors: (1) the relationship of the parties, and (2) the foreseeability of the risk involved. Gilbertson v. Leininger, 599 N.W.2d 127, 130 (Minn. 1999); Erickson v. Curtis Inv. Co., 447 N.W.2d 165, 168-69 (Minn. 1989).[8] We agree with the district court that, as a matter of law, neither Johnson Controls nor KRISS owed a duty of care to Mr. Reimer under the circumstances of this case. Johnson Controls was contracted by the School District to provide automatic temperature controls services, associated air conditioning and heating services, and filter services. The Planned Service Agreement between the School District and Johnson Controls outlined specific services to be provided by Johnson Controls, including specific services related to the boiler. It is undisputed that the contract did not include repair or maintenance of the boiler nipples nor did Johnson Controls ever work on the nipple that caused Mr. Reimer's injury. The mere fact that on occasion Johnson Controls would do additional non-contract work does not make it responsible for the deterioration of the boiler nipple or create a duty on its part to anyone down the line

---

[8] A court need not look at the foreseeability factor if there is no special relationship between the parties. Errico v. Southland Corp., 509 N.W.2d 585, 587 (Minn. 1993).

-13-

who may be harmed by the boiler. Nor was a duty created on March 10th when a Johnson Controls employee refused Mr. Nelson's request to tighten the corroded nipple, a task that was not within Johnson Controls' contractual responsibilities. See In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1493 (8th Cir. 1997) (explaining that the threshold inquiry in the "gratuitous undertaking" duty analysis is whether the defendant specifically undertook the services allegedly performed). In short, there is no basis in the record to establish that Johnson Controls owed a duty to Mr. Reimer and the district court properly granted summary judgment in its favor.

Summary judgment in favor of KRISS was also proper. Pursuant to a contract with the School District, KRISS supplied chemicals for use in the swimming pool boiler to control unwanted mineral levels. Mr. Reimer alleges that KRISS's negligent chemical water treatment program caused the corrosion in the boiler. Assuming Mr. Reimer's allegation is true, we nevertheless discern no duty on KRISS' part to Mr. Reimer. KRISS owed a contractual obligation to the School District to supply chemicals as necessary for the upkeep of the pool and its boiler. Nothing in that contractual relationship supports a finding of a duty on KRISS's part to Mr. Reimer, an independent contractor who was hired by the School District for consultation and/or repair of the boiler. Further, at the time of Mr. Reimer's injury, the School District was aware of the corrosive condition of the nipple, as evidenced, at a minimum, by Mr. Nelson's interaction with Johnson Controls on March 10th. We agree that it was not reasonably foreseeable on KRISS's part that, with this knowledge, Mr. Nelson, a licensed boiler engineer, would permit an independent contractor to work on the boiler at and around the badly corroded nipple without taking appropriate precautionary measures. See Gilbertson, 599 N.W.2d at 131 ("In order to find that a special relationship exists, it must be assumed that the harm to be prevented by the defendant is one that '[the defendant] is in a position to protect against and should be expected to protect against.'") (citation omitted).

-14-

B. Primary Assumption of Risk

As an alternative basis for granting summary judgment, the district court held that "[e]ven if the [defendants] did owe Reimer a duty, [they] are still not liable for his injuries because Reimer assumed the risks involved with boiler repair work." Reimer, No. 00-370, slip op. at 7.[9] The elements of primary assumption of risk are: (1) the plaintiff had knowledge of the risk, (2) the plaintiff appreciated the risk, and (3) the plaintiff had a choice to avoid the risk but voluntarily chose to accept the risk. Kraft v. Ingersoll-Rand Co., 136 F.3d 584, 586 (8th Cir. 1998) (applying Minnesota law); Andren v. White-Rodgers Co., 465 N.W.2d 102, 104-05 (Minn. 1991); Wegscheider v. Plastics, Inc., 289 N.W.2d 167, 169-70 (Minn. 1980).

The doctrine requires actual knowledge of a known risk. Wegscheider, 289 N.W.2d at 170; Coenen v. Buckman Bldg. Corp., 153 N.W.2d 329, 338 (Minn. 1967) ("[W]here it merely appears that [the plaintiff] should or could have discovered the danger, the defense is contributory negligence and not assumption of the risk."), quoted in Beckman v. V.J.M. Enters., Inc., 269 N.W.2d 37, 39 (Minn. 1978); Snilsberg v. Lake Washington Club, 614 N.W.2d 738, 746 (Minn. Ct. App. 2000) ("Application of the doctrine requires actual, rather than constructive, knowledge.") (citing Parr v. Hamnes, 228 N.W.2d 234, 237-38 (Minn. 1975)). Primary assumption of risk does not apply when a defendant's conduct has enlarged or obscured the risk to the plaintiff. Kaiser v. N. States Power Co., 353 N.W.2d 899, 904-05 (Minn. 1984) (holding that landowner was not shielded from liability where his misconduct

---

[9] Because we hold that Johnson Controls and KRISS owed no duty to Mr. Reimer, primary assumption of the risk is inapplicable with regard to those defendants. See Louis, 636 N.W.2d at 321 ("If no duty existed, there is no need to determine whether respondent assumed the risk . . . .") (citing Baber, 531 N.W.2d at 495). Thus, our discussion of the doctrine applies only to the School District and the City. And again, for summary judgment purposes, we deem the School District and City joint owner-operators of the pool facilities.

-15-

materially enhanced the risk or created a new risk of harm beyond that assumed by firefighters as incidental to fighting fires); Rusciano, 445 N.W.2d at 273 (person standing in path of motor vehicle did not assume risk of being hit when vehicle accelerated, thereby enlarging the risk);. "Whether a party has primarily assumed the risk is usually a question for the jury unless the evidence is conclusive." Schneider, 654 N.W.2d at 148 (citing Hollinbeck v. Downey, 113 N.W.2d 9, 13 (Minn. 1962)).

The district court's conclusion that Mr. Reimer assumed the risk of his injury was based primarily on the following: 1) Mr. Reimer, a boiler repair expert, was at the school to examine the boiler pursuant to reports of moisture and leaking; (2) as an expert, Mr. Reimer knew and appreciated that moisture and leaking lead to corrosion of the metal comprising the boiler; (3) Mr. Reimer knew that the boiler was operational and contained pressurized 250 degree water. Given these facts, the district court concluded that Mr. Reimer knew and appreciated the risk of being burned while examining the boiler and could have avoided that risk by first cooling down the boiler. Accordingly, Mr. Reimer's injury directly flowed from his decision to confront the known dangerous condition rather than avoid it and therefore he assumed the risk of his injury. We do not necessarily disagree with this logic. However, we do believe that it conflicts with Minnesota's interpretation and application of the primary assumption of risk doctrine.

In Olson v. Hansen, 216 N.W.2d 124 (Minn. 1974), the Minnesota Supreme Court discussed the doctrine of assumption of risk:

> Assumption of risk has two separate and distinct concepts: Primary and secondary assumption of risk. Primary assumption of risk is not so much an affirmative defense as an expression of the idea that the defendant owes a limited duty of care to the plaintiff with respect to the risk incident to their relationship. . . .
>
> Primary assumption of risk is applicable only where parties have

-16-

voluntarily entered a relationship in which plaintiff assumes well-known, incidental risks. As to those risks, the defendant has no duty to protect the plaintiff and, thus, if the plaintiff's injury arises from an incidental risk, the defendant is not negligent.

Id., at 127 (footnote omitted);[10] see also Armstrong v. Mailand, 284 N.W.2d 343, 351 (Minn. 1979) ("The doctrine of primary assumption of the risk technically is not a defense, but rather a legal theory which relieves a defendant of a duty which he might otherwise owe to the plaintiff with respect to particular risks.") (citation omitted). The application of the primary assumption of risk doctrine "is dependent upon the plaintiff's manifestation of consent, express or implied, to relieve the defendant of a duty." Id. "'[N]ot every deliberate encountering of a known danger . . . is reasonably to be interpreted as evidence of such consent.'" Iepson v. Noren, 308 N.W.2d 812, 815 (Minn. 1981) (quotation omitted); accord Evanson v. Jerowski, 241 N.W.2d 636, 640 (Minn. 1976).

"Minnesota courts rarely apply primary assumption of the risk, and have found that its application is only appropriate under limited circumstances." Schneider v. Erickson, 654 N.W.2d 144, 149 (Minn. Ct. App. 2002); accord Springrose v. Willmore, 192 N.W.2d 826, 827 (Minn. 1971) ("The classes of cases involving an implied primary assumption of risk are not many . . . ."); Rusciano v. State Farm Mutual Auto. Ins. Co., 445 N.W.2d 271, 273 (Minn. Ct. App. 1989) ("Application of the primary assumption of risk doctrine is uncommon.").[11] In even fewer cases is the

---

[10] "In its 'secondary' sense assumption of risk means simply that the plaintiff was guilty of contributory negligence or fault." Swagger v. City of Crystal, 379 N.W.2d 183, 184 (Minn. Ct. App. 1985) (quoting Pitts v. Electro-Static Finishing, Inc., 607 F.2d 799, 801 n.2 (8th Cir. 1979)).

[11] In Minnesota, primary assumption of risk has been most often applied to inherently dangerous sporting events. See, e.g., Grisim v. Tapemark Charity Pro-Am Golf Tournament, 415 N.W.2d 874 (Minn. 1987) (golf); Wagner v. Thomas J. Obert Enters., 396 N.W.2d 223 (Minn. 1986) (rollerskating); Swagger v. City of Crystal,

evidence "so clear and undisputed as to present no fact issues for the jury to decide, and the actions of the claimant . . . such as to constitute primary assumption of risk as a matter of law." Goodwin v. Legionville Sch. Safety Patrol Training Ctr., Inc., 422 N.W.2d 46, 50 (Minn. Ct. App. 1988).

The issue, then, is whether the undisputed facts in this case permit only one conclusion: that Mr. Reimer's serious burn injuries from the boiler were a well-known, incidental risk of the type of work voluntarily entered into by Mr. Reimer pursuant to the relationship between him and the defendants. The district court and the defendants have construed the relationship and risk broadly to conclude that the risk of being burned by scalding water is always incident to working on a boiler containing scalding water. Plaintiff advocates a more narrow construction so that the risk of being burned by scalding water would not necessarily be a "well-known incidental risk" to performing an ultrasound test on a boiler because the ultrasound procedure is noninvasive and the information to be garnered from the ultrasound was unrelated to the breakdown of the boiler at the nipple/bunghole area. Plaintiff also argues that the defendants' conduct enlarged and obscured the risk of harm.

After careful review of Minnesota's case law in this area, we find that the plaintiff's argument accords with Minnesota law. In Armstrong, the Minnesota Supreme Court found in favor of defendants in a wrongful death/negligence action after three firemen were killed in an explosion during a liquid petroleum fire which resulted in a boiling liquid expanding vapor explosion ("BLEVE"). 284 N.W.2d at 249-53. After rejecting a special "fireman's rule," the Armstrong court applied the primary assumption of risk analysis. Id. The court began with a broad

---

379 N.W.2d 183 (Minn. Ct. App. 1985) (softball). But see Olson, 216 N.W.2d at 128 (rejecting defendant's argument that "tipping or rolling" is a natural incident of the sport of snowmobiling because "[a]lthough this may be a hazard in the activity, it is one that can be successfully avoided.")

characterization of the relationship-risk connection but then went on to a more particularized analysis:

> Although there is abundant evidence of negligence or products defects which caused or contributed to the unfortunate and disastrous fire, . . . the dispositive question in this case becomes: Is there a genuine issue of whether the risk of injury was reasonably apparent to the firemen? There is no question that the danger from the small fire at the pool of LP gas near the truck was reasonably apparent. Thus, it is clear that any negligence or product defect causing the initial fire provides no basis for recovery.
>
> *Our inquiry must be more detailed, however. The record indicates that the particular risk causing the deaths was a BLEVE.* Still, the record is clear that the firemen in West St. Paul knew that when they encountered a fire at an LP gas storage facility a BLEVE was *a reasonably apparent danger and one of the risks involved in* fighting such a fire. . . . The fact remains that the firemen knew a BLEVE could occur, even though, like with any risk, they did not know exactly when the danger would manifest itself.

Id. at 352-53 (emphasis added).

Thus, Armstrong rejects a generalized approach in favor of a "more detailed" inquiry into the "particular risk" causing the injury. See also Griffiths v. Lovelette Transfer Co., 313 N.W.2d 602, 605 (Minn. 1981) ("[E]ach situation encountered may involve some risks which are anticipated and assumed and some which are unanticipated and therefore unassumed."); Rieger v. Zackoski, 321 N.W.2d 16, 23 (Minn. 1982) (rejecting defendant's attempt to characterize risk generally as leaping over racetrack fence and instead stating that particular risk was leaping fence "after the races had concluded for the day" when such conduct "may well have been presumed to be acceptable"). This is consistent with the Minnesota courts' cautionary language regarding the limited applicability of the doctrine. See, e.g.,

Schneider, 654 N.W.2d at 149; Rusciano, 445 N.W.2d at 273; Goodwin, 422 N.W.2d at 50.

Mr. Reimer's injuries were caused by scalding water and steam escaping from the boiler. The possibility that a repairman working on a malfunctioning boiler may be burned appears, on a general level, relatively self-evident. Whether such injury is a "well-known incidental risk," however, is a particularized and fact-intensive inquiry under Minnesota law. Mr. Reimer's actual knowledge and appreciation of the risk turns on many factors, such as the nature of the repair problem as originally described, whether Mr. Reimer, and other similarly trained repair experts, ever conduct pre-repair testing on an active boiler, and what Mr. Reimer observed or was told about the corroded nipple as a risk-enhancing condition.

According to his testimony, Mr. Reimer considered an ultrasound a noninvasive procedure which posed little risk of harm. He had done similar tests many times on, in his view, similarly rusty boilers without cooling them down first. And nothing in his observations or discussions with Mr. Nelson suggested that this particular boiler posed a heightened risk of danger. Mr. Reimer's version of events will, of course, be subject to challenge by defendants, but, at this stage, these facts create a genuine issue as to Mr. Reimer's actual knowledge of the risk in this case. See Kraft, 136 F.3d at 586 (reversing summary judgment to defendant and finding significant to appreciation of risk element that plaintiff "had placed her hands and feet into this gap before without incident."); Piotrowski v. Southworth Prods. Corp., 15 F.3d 748, 753 (8th Cir. 1994) (holding that plaintiff who was injured in fall from table "did not have actual knowledge of a known risk and he did not make the choice to chance the risk rather than avoid it" where "[he] and other employees had similarly stood or stomped on the lift table without incident for seven months."); Johnson v. S. Minn. Mach. Sales, Inc., 442 N.W.2d 843, 848 (Minn. Ct. App. 1989) (noting as factor in appreciation of risk analysis that plaintiff saw his shop teacher and foreman use saw without harm).

Granting Mr. Reimer the benefit of all favorable inferences from the record, a jury could reasonably conclude that based on the information he possessed at the time and given the task he was performing, the risk of being burned while examining the School District's boiler on March 10, 1998, was neither a reasonably apparent danger nor a reasonably foreseeable incidental risk. See Wegscheider, 289 N.W.2d at 170 ("In order to assume the risk of a particular act or condition one must know and appreciate the danger itself and not just the facts which constitute it."). Cf. Walk v. Starkey Mach., Inc., 180 F.3d 937, 940 (8th Cir. 1999) (applying Minnesota law and affirming summary judgment where "it is undisputed that Walk placed his hand in the trough knowing that the auger was engaged and knowing that the moving blades posed a substantial risk to him."); Andren, 465 N.W.2d at 105-06 (affirming summary judgment where evidence conclusively demonstrated that plaintiff knew and appreciated the danger of lighting a cigarette in the presence of liquid propane gas and knew and appreciated that there was a liquid propane gas leak in the basement); Armstrong, 284 N.W.2d at 353 ("[A]ny improper operation of the release valve merely increased the risk of a BLEVE; it did not remove the occurrence of a BLEVE from the risks reasonably anticipated by the . . . firemen.").

There is, to be certain, considerable evidence adverse to Mr. Reimer's case. Most significantly, he is an experienced expert in the field of boiler repair and the risk of harm could have been completely avoided by turning off the boiler and letting it cool overnight. See Walk, 180 F.3d at 939 (finding plaintiff's extensive experience a significant factor in favor of applying primary assumption of the risk where harm could have been easily avoided). Moreover, Mr. Reimer concedes that he saw some corrosion on the nipple and lower left rear of the boiler prior to starting the ultrasound procedure and that it was his choice as to how to conduct the test. That said, material fact disputes remain as to whether Mr. Reimer had *actual knowledge* of the risk. See Wegscheider, 289 N.W.2d at 170; Beckman, 269 N.W.2d at 39. And, as reflected in our discussion of duty, there is also a genuine issue of material fact as to whether Mr. Reimer appreciated that risk. On this record it is not "clear [that] a reasonable

person in [Mr. Reimer's] position must have understood the danger." Andren, 465 N.W.2d at 106. Accordingly, we cannot say as a matter of law that Mr. Reimer implicitly or explicitly manifested an agreement to assume the risk of his actions in this instance. See Coenen, 153 N.W.2d at 338 ("Knowledge of the particular risk or danger and an appreciation of the magnitude thereof are independent and essential elements of the doctrine of assumption of risk."), quoted in Wegscheider, 289 N.W.2d at 170. See also Griffiths, 313 N.W.2d at 605 (affirming trial court finding that although police generally assume the risks inherent in their duties, the plaintiff-policeman could not have anticipated and therefore did not assume "the risk of being struck by a downed utility pole which was jerked into the air when a passing automobile snagged a guide wire attached to the pole.").

In reaching this conclusion, we are mindful that the Minnesota Supreme Court has itself acknowledged that "application of the doctrine of assumption of risk is confusing and has led to seemingly inconsistent decisions." Baber, 531 N.W.2d at 495. In our view, this comment by Minnesota's highest court underscores that, where primary assumption of risk is at issue, only those cases with overwhelming and conclusive records lend themselves to summary judgment resolution. This is not such a case.[12]

_____

[12] Mr. Reimer also contends that the defendants enlarged and obscured his risk of harm by failing to point out the corroded nipple and/or tell him about the Johnson Controls employee's comments from earlier that day. See, e.g., Schneider, 654 N.W.2d at 149 ("[P]rimary assumption of the risk may not apply if appellant can show that respondent enlarged the risk to appellant.") (citation omitted). The district court did not address this theory of liability with regard to the landowner defendants. We decline to further address this issue and assume it will be taken up on remand.

-22-

III.


Because Johnson Controls and KRISS owed no duty of care to Mr. Reimer, the district court properly granted summary judgment in their favor and we affirm that aspect of the district court's ruling. As to the School District and City, however, we find genuine issues of material fact preclude summary judgment resolution on the question of the duty of care owed by those defendants. We also find genuine issues of material fact with regard to whether Mr. Reimer relieved the defendants of any duty owed by assuming the risk of his actions. Accordingly, as to the School District and City, we reverse and remand for further proceedings consistent with this opinion.



A true copy.


Attest.


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.